**TRANS UNION CORPORATION,**
**Petitioner**

v.

**FEDERAL TRADE COMMISSION,**
**Respondent.**

**No. 94–1725.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1995.

Decided April 19, 1996.

---

Roger L. Longtin, Chicago, IL, with whom Stephen L. Agin, Chicago, IL, and Philip L. O'Neill, Washington, DC, were on the brief, argued the cause for petitioner.

Lawrence DeMille–Wagman, Attorney, Federal Trade Commission, with whom Jay C. Shaffer, Deputy General Counsel, and Ernest J. Isenstadt, Assistant General Counsel, were on the brief, Washington, DC, argued the cause for respondent.

Before: WILLIAMS, ROGERS and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The Federal Trade Commission has held that Trans Union Corporation's sale of certain mailing lists was a communication of "consumer reports" for a purpose that was impermissible under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* (1994). In reaching the threshold conclusion that the lists were consumer reports, the Commission found that the information embodied in the lists was "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing" the credit "eligibility" of the persons listed. *Id.* § 1681a(d). To support its finding, it relied on no evidence other than the undisputed fact that the information had been "included as one section in credit reports that are routinely sent to credit grantors" for the purpose of establishing credit eligibility. Final Order, *In the Matter of Trans Union Corporation,* Slip Copy, Dkt. No. 9255 (Sept. 28, 1994) ("Commission Decision") at 23.

We reverse and remand the case to the Commission. Even the Commission does not embrace the concept that mere inclusion of a fact *in* a report prepared for credit eligibility purposes establishes that the fact satisfies the statutory test; the Commission has failed adequately to distinguish its own decisions rejecting that principle; and the statutory language does not support such a principle.

\*　　\*　　\*

Trans Union is a consumer reporting agency that collects and resells data about the credit and payment patterns of over a hundred million Americans. Typical buyers of this information are firms considering extending some kind of credit to the consumers about whom they inquire; they use Trans Union's information to evaluate whether the consumers are good credit risks. This core business is clearly subject to the Act because the data sold meet the Act's definition of "consumer reports." 15 U.S.C. § 1681a(d) (1994).

In 1987 Trans Union diversified, launching a "target marketing" division. That division—first TransMark, now Trans Union Lists—uses data from Trans Union's consumer reporting database, CRONUS, to create mailing lists. The lists are sold to companies wishing to send sweepstakes entries, catalogs, circulars, and other solicitations to classes of customers that they believe will be particularly responsive to their pitches.

For each person listed, the CRONUS database contains a variety of information, such as name (and aliases), social security number, addresses, phone numbers, occupation, gender, ethnic background, marital status and education. It also contains information about the listed person's credit history on any credit account, each such account being known as a "tradeline." From this universe Trans Union has created a special "base list" for target marketing purposes, the list's common denominator being that each person listed has at least two tradelines. But a tradeline is a tradeline, *regardless* of whether the person's performance on the account has been perfect or disastrous; mere *existence* of the two accounts is all that matters for inclusion in the base list. Trans Union also creates a rich variety of sublists based on additional data in the base list, leading to such titles as "Empty Nesters," "Urban Ethnics," and "Suburban Elite." (Trans Union even offers a "hotline" list of consumers who have responded to a credit card solicitation within the past month or so, and are thus, presumably, especially ready, eager and able to consume.)

The mailing lists are simply collections of names and addresses, but because Trans Union has used special criteria to cull them from its database, a buyer of any list also knows that the persons named satisfy the specified

criteria. Thus a buyer of *any* of Trans Union's target marketing lists knows that every person named has at least two credit accounts. And he would also know, as to any list, that listed persons satisfied its particular subcriteria. The FTC claims that this implicit information—even the mere fact that a listed person has two tradelines—transforms Trans Union's lists from legally innocuous mailing labels to consumer reports covered by the limitations of the Act.

Trans Union's main objection to the decision is that its lists are not "consumer reports" as defined by the Act, primarily because, it argues, it has not collected the implicit information conveyed therein to serve as a factor in determining credit eligibility. The Commission's finding to the contrary is especially vulnerable, in its view, because the Commission reached its decision under "summary decision" procedures, 16 CFR § 3.24 (1993) (modeled on judicial interpretations of Rule 56 of the Federal Rules of Civil Procedure, see Gellhorn & Robinson, *Summary Judgment in Administrative Adjudication*, 84 Harv.L.Rev. 612, 626 (1971)), without allowing Trans Union a hearing. Trans Union also argues that even if the lists are "consumer reports," selling them to mass mailers is a permissible purpose under the Act, and, finally, that if the Act does allow the FTC's contrary holdings, its cease-and-desist order is a prior restraint of speech in violation of the First Amendment.

The Commission's error on the first issue requires reversal. Trans Union raised an issue of material fact precluding the Commission's summary decision that Trans Union's lists are consumer reports. Accordingly, we grant Trans Union's petition for review and remand the case to the FTC for further factual development. We reject Trans Union's contention that use of genuine consumer reports for target marketing would be a permissible use, but we do not reach its First Amendment claim.

\*　　\*　　\*

*Standard of review*

Both Trans Union and the FTC, noting the Act's "administrative enforcement" provision, 15 U.S.C. § 1681s(a) (1994), agree that the Commission has enforcement but not rule-making authority under the Act. Trans Union argues from this that the FTC's interpretations of the Act are entitled only to the rather limited type of deference that the Supreme Court has found suitable for the Equal Employment Opportunity Commission in its enforcement of Title VII, in partial reliance on the EEOC's lack of rulemaking authority. See *General Electric Co. v. Gilbert*, 429 U.S. 125, 140–46, 97 S.Ct. 401, 410–13, 50 L.Ed.2d 343 (1976); *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 256–57, 111 S.Ct. 1227, 1234–35, 113 L.Ed.2d 274 (1991). That deference is a type most famously expressed in *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944), under which "the level of deference afforded will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id.* at 140, 65 S.Ct. at 164, quoted in *General Electric*, 429 U.S. at 142, 97 S.Ct. at 411; *Arabian American Oil Co.*, 499 U.S. at 257, 111 S.Ct. at 1235.

The Commission's apparent lack of rulemaking power under the Act does not seem to us in itself to make a solid case for withholding *Chevron* deference. See *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, we have extended *Chevron* deference to agency interpretive rules, see *Health Ins. Ass'n of Am. v. Shalala*, 23 F.3d 412, 424 n. 8 (D.C.Cir.1994) (citing cases); indeed, the rule at issue in *Chevron* itself appears to have been interpretive. See *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1108–12 (D.C.Cir.1993). And we have expressly held that *Chevron* deference extends to interpretations reached in adjudications as much as to ones reached in a rulemaking. *Midtec Paper Corp. v. United States*, 857 F.2d 1487, 1497 (D.C.Cir.1988). Moreover, there is, for the EEOC, a rather strong alternative ground for withholding *Chevron* deference—the fact that its role is, like the Justice Department's in enforcement of criminal statutes, the role of prosecutor. See *Crandon v. United States*, 494 U.S. 152, 177, 110 S.Ct. 997, 1011, 108 L.Ed.2d 132 (1990)

(interpretation of criminal statutes by Department of Justice and other agencies not given *Chevron* deference) (Scalia, J., concurring). Finally, the FTC notes that the courts of appeals have often given its interpretations of the Act great deference, see, e.g., *Estiverne v. Sak's Fifth Ave.*, 9 F.3d 1171, 1173 (5th Cir.1993) (citing *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d at 703 (1984)); the inferences from that deference are uncertain, however, as the courts have not discussed the Commission's lack of rulemaking power under the Act, or any other Commission characteristics specific to the Act.

It turns out that we can decide this case without resolving the level of deference due. Even under *Chevron*'s lenient standard the FTC's conclusion that all of Trans Union's mailing lists are consumer reports under the Act cannot stand, as there is no permissible construction of the statute under which it could reach its conclusion without further factual exploration. As to Trans Union's other statutory claims, the FTC's holdings survive review even under the less deferential *Skidmore* standard.

*Whether Trans Union's lists are "consumer reports" under the Act*

■ The Act defines "consumer report" as follows:

> The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency [A] bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living [B] which is *used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for (1) credit* or insurance to be used primarily for personal, family, or household purposes, or (2) employment purposes, or (3) other purposes authorized under section 1681b of this title.

15 U.S.C. § 1681a(d) (emphasis added). To qualify as the sort of "information" that can constitute a consumer report, then, an entry on a Trans Union mailing list must (A) "bear[ ] on" at least one of seven factors and

(B) be used, expected to be used, or collected for one of three types of purposes.

The first element does not seem very demanding, and we do not understand Trans Union even to contest the proposition that a person's having two tradelines "bear[s]" on one or more of the seven enumerated factors. After all, it bears at least on his mode of living, in telling us that he has bothered to establish two credit accounts. A person's appearance on any special sublist, such as "Upscale Retail," would of course convey more mode-of-living information.

In addressing the next factor, whether information in the lists is "used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility" for various benefits, the Commission considered only credit eligibility, and we follow suit. Further, it did not claim that the tradeline information was "used or expected to be used" as a factor in determining credit eligibility, only that it had been "collected" in whole or in part for that purpose. It drew the inference of that purpose solely from the following undisputed fact:

> The tradeline information is *included* as one section in credit reports that are routinely sent to credit grantors for the purpose of serving as a factor in establishing the consumer's eligibility for one of the transactions set forth in the [Fair Credit Reporting Act].

Commission Decision at 23 (emphasis added).

We have no trouble at all with the Commission's view that it is proper to look to the respondent's general consumer reporting business—rather than to the particular (allegedly objectionable) use to which the information is being put—for light on its purposes in collecting the information. See, e.g., *Hansen v. Morgan*, 582 F.2d 1214, 1218 (9th Cir.1978). But the Commission goes further, citing the *Hansen* court's observation that "unless the [consumer reporting agency] was generally collecting such information for purposes not permitted by the Act, it must have collected the information ... for use consistent with the purposes stated in the Act." *Id.* In the Commission's hands this turns into an implicit theory of mingling: any scrap

of information transmitted to credit grantors as part of a credit report must necessarily have been collected "in whole or in part for the purpose of *serving as a factor*" in determining credit eligibility. But *Hansen* dealt with the delivery of a full credit report into the hands of a congressional candidate's political enemy, and the court there had no occasion to classify minute items of discrete information.

If the mingling theory were taken at face value, a pure list of names, with no implicit information other than that they were collected by the agency, would qualify as a consumer report. The Commission explicitly (and we think inevitably) rejects that position. In a settlement with Trans Union's competitor TRW over its target marketing list business, the Commission permitted TRW to market lists from its credit reporting database based on such "identifying information" as name, zip code, age, social security number or "substantially similar identifiers." Letter from Federal Trade Commission to TRW, September 24, 1992.[1]

The Commission appears to distinguish its position in TRW on the principle that the data there related only to identification.[2] Fine. But the proposition that some information can be classed as "identification information" does not lead as a matter of simple logic to the conclusion that *all* other information is necessarily transmitted for the purpose of serving as a factor in determinations of credit eligibility. It is nowhere written that the credit-report world is divided into two (and only two) such parts. As to a tradeline, it constitutes an obvious way for Trans Union to organize and store the payment information within CRONUS—to associate payments and other developments for a single account to be gathered together in a coherent chronology. Indeed, the datum "existence of a tradeline" seems not so much

"collected" by Trans Union as created by it for organizing the nuts-and-bolts payment data upon which credit decisions are made. If use for such organizational purposes were fatal under the Act, then *any* field in CRONUS—e.g., name, address or social security number—would be equally condemned.

Not only is the Commission's identification-credit divide without inherent conceptual support, but its application, as between Trans Union and TRW, is flawed. Zip codes (e.g., Beverly Hills 90210 and kindred upscale zip codes around the country), which TRW is free to transmit, seem to have at least as much creditworthiness value as knowing simply that a person once borrowed money, with the repayment record unknown. Moreover, one wonders whether appearance on TRW's FTC-approved lists does not itself imply at least *one* tradeline. Presumably a consumer obtains an entry in CRONUS or its TRW counterpart only through obtaining credit in one form or another.

While the Commission staff relied entirely on its mingling theory (coupled with an exception illogically limited to questionably classified "identification" information), Trans Union (besides asking for a hearing) submitted an affidavit from its director of marketing, Peter J. Hopfensperger. After delineating some of the factors used by customers who use other Trans Union information to evaluate credit prospects, Hopfensperger said that the base list does not contain "any information upon which a credit grantor can make a judgment as to a consumer's eligibility for credit." Affidavit of Peter J. Hopfensperger ¶ 7. If one contrived to characterize anything in the record as supplying some thin factual support for the staff position, this would at least serve as a counterweight and help create a genuine dispute of material fact about the purposes for which the data were

---

1. The letter restates a tentative agreement between the FTC staff and TRW to amend an existing consent decree relating to TRW's target marketing lists. The parties did not include any actual amendment in the record, but do not dispute that such amendment was made.

2. The Commission voiced this distinction in explaining why the TRW decree was not in conflict with its finding that the tradelines fact was one

"bearing on" the seven factors enumerated in § 1681a(d). Commission Decision at 27 n. 18. As we show in the text, the attempted distinction fails because of the falsity of its unspoken premise that if a fact is classified as identifying an individual, it can have no other function. The falsity applies equally to the analyses of whether a fact "bear[s] on" one of the seven factors and of the purpose for which it was collected.

collected. In fact, as noted above, the Commission staff offered nothing to support its view, precluding summary action in its favor regardless of Trans Union's evidence.

On remand, if the FTC wishes to classify existence-of-tradeline information as a consumer report, it must gather evidence that indicates that Trans Union intended the mere existence of a tradeline, as distinguished from payment history organized thereunder, to serve as a factor in credit-granting decisions, or, of course, that someone used or expected it to be used for that purpose. Evidence—lacking here—that credit decisions could be made, even in part, on such "existence" information might be probative of Trans Union's intent.[3] If, under this standard, tradeline-existence information is found not to have been collected to serve as a factor in credit-granting decisions, the FTC may of course embark on a similar inquiry about any individual list criterion to which it objects.

\* \* \*

Trans Union also argues that, even if its lists otherwise met § 1681a(d)'s definition of consumer reports, its sale of them to target marketers did not amount to "communications" under that definition ("The term 'consumer report' means any written, oral, or other communication of any information by a consumer reporting agency . . ."). Its argument is that although Trans Union's target marketing customers know the criteria for list selection, at least most of the time they do not see the names but have third-party labeling houses do the work of getting the mail out. The customers know the criteria but not the names; the third parties know the names but not the criteria. Therefore, the argument goes, any credit information implicit in the resulting lists remains latent and is not actually communicated.

We find the theory too casuistic. Once the information passes from Trans Union to the client or its designated third party mailer, it is within the client's control. It has therefore been "communicat[ed]" to the client,

whether or not the client chooses to review it.

Trans Union suggests some sort of inconsistency between this position, which we take to be the FTC's, and FTC commentary on prescreening. 16 C.F.R. § 600 app. at 389 (1995). Prescreening involves the sale of lists, with names generated by reference to creditworthiness, to customers who propose to make a firm offer of credit to each listed person, so that the communication is for purposes of granting credit and thus is permissible under the Act. The Commission also allows the lists—but not the criteria used in selecting them—to be sent to third parties for the purposes of further paring them down on the basis of demographic criteria supplied by the customer. But this policy sheds no light on whether Trans Union "communicates" information to its target marketing customers. The Commission approves the transfer of data to the prescreener *not* on any theory that it is not a "communication" but because it is part of a communication made for permissible credit-granting purposes. In contrast, Trans Union's communication to the target marketer, as we shall see, is not.

\* \* \*

*Whether target marketing is a legitimate business purpose under the Act*

■ Section 604 of the Act, 15 U.S.C. § 1681b, spells out the purposes for which a credit report may be "furnish[ed]," specifying transfers to a person for purposes of credit extension and various other limited purposes, and making a catchall reference to transfers to anyone having a "legitimate business need for the information in connection with a business transaction involving the consumer." 15 U.S.C. § 1681b(3)(E). Trans Union argues that its target marketing sales satisfy this standard. There is, after all, nothing illegitimate about target marketing per se.

At the outset this involves a standard difficulty with any catchall phrase—that it should not be read so broadly as to render all the specific terms superfluous or so narrowly as

---

**3.** We note in this connection Trans Union's oblique hint at oral argument that it uses the two-tradeline minimum merely to ensure a higher degree of certainty that persons listed truly *live* at their respective listed addresses.

to become superfluous itself. Further, § 1681a(d)'s definition of "consumer report" cross references § 1681b, so that if § 1681b(3)(E) is read broadly all manner of things may be swept up in the definition of consumer reports, but if it is read narrowly the Act may constrain "legitimate business" transactions far more than Congress is likely to have contemplated. One court found the tension so great that it concluded that § 1681b meant one thing in its use on location, another in its use as cross-referenced by § 1681a(d). *Ippolito v. WNS, Inc.*, 864 F.2d 440, 451–52 n. 11 (7th Cir.1988). We think that this case, at least, may be resolved without such desperate measures.

The Commission found implicit in § 1681b(3)(E), at least in the context of companies trying to sell goods or offer insurance or credit, a requirement that the "consumer have sought to initiate the transaction." Commission Decision at 38. We think that reflects a wholly appropriate definition of "legitimate business need" by reference to the purposes of the Act and the other permissible purposes listed in § 1681b. Along with accuracy of collected information, a major purpose of the Act is the privacy of a consumer's credit-related data. "There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4). It seems consistent with this view that information about a consumer, once it has been found to have the sensitive character required to qualify as a consumer report covered by the Act, be kept private except under circumstances in which the consumer could be expected to wish otherwise or, by entering into some relationship with a business, could be said to implicitly waive the Act's privacy to help further that relationship. While an upscale clothier's possession of "consumer information" for purposes of sending a catalog is not a major invasion of privacy, we think it reasonable of the Commission to regard it as outside that kind of implicit consent or waiver.

Trans Union argues that the Commission has contradicted its own customer-initiation requirement under § 1681b(3)(E) in its approval of the use of consumer reports for "prescreening." That, it will be recalled, involves sale of a list of people preselected for creditworthiness by some specified criteria, where the buyer of the list agrees in advance to make a firm offer of credit to each listed person (after the list is subjected to demographic massaging by a third party). 16 CFR § 600 App. at 389 (1995). The recipients of such offers of course have not initiated the transaction. Quite apart from whether this might not be a perfectly reasonable *addition* to the purposes permissible under § 1681b(3)(E), the Commission's approval in fact rests on § 1681b(3)(A), which allows transfer of a consumer report to a person intending to use it "in connection with a credit transaction" and "involving the extension of credit to ... the consumer [as to whom the information applies]." While the consumer has not initiated a transaction, being singled out for a firm offer of credit is exactly the sort of thing the Act seeks to promote, and a purpose for which it is quite reasonable to infer the consumer's implicit waiver or consent. Moreover, prescreening and the guaranteed offers of credit it spawns can *only* take place through the use of consumer reports, whereas the use of credit data for non-credit-related mailings is at most helpful to those ends. The "legitimate business" catchall of § 1681b(3)(E) is best understood as meaning types of business transactions similar to those set forth in subsections (A) through (D), i.e., those for which information gathered for credit (and the other specific purposes) is central. See *Houghton v. New Jersey Mfrs. Ins. Co.*, 795 F.2d 1144, 1152 (3rd Cir.1986) (applying rule of *ejusdem generis* to § 1681b(3)(E)) (Sloviter, J., concurring). While it may be hard to firmly articulate just what is similar to though not contained within § 1681b(3)'s other purposes, *id.*, we find no resemblance between target marketing and those other purposes: extension of credit, employment, underwriting of insurance, and license eligibility. 15 U.S.C. § 1681(b)(3)(A)–(D). If Trans Union's provision of lists derived from its "base list" for target marketing is to be lawful under the Act, it must be because the information is not so sensitive as to rise to the level of a consumer report.

*Trans Union's First Amendment claim*

Trans Union raises a serious First Amendment claim with respect to the Act's application. Its target marketing list competitors who aren't consumer reporting agencies under the Act can use any information they gather—including credit information—in the preparation of their lists. In fact, because of its interpretation of "collected ... for the purpose ..." in the Act, the Commission would evidently permit Trans Union to sell its target marketing lists if the data were "separately obtained for target marketing purposes." Commission Decision at 51. Although we have no explicit Commission discussion of what may be necessary for data to be "separately obtained," the requirement appears to impose on Trans Union some kind of utterly wasteful expenditure of resources. The result of the disparity between Trans Union and its competitors, and the Commission's effort to palliate that disparity by creation of what looks like a mickey-mouse exception, may well indicate a fatal lack of fit between the Act's goals and the FTC's means of enforcement. See, e.g., *Blount v. SEC,* 61 F.3d 938, 946 (D.C.Cir.1995). But we are reluctant to reach this constitutional issue because of the very serious doubt whether Trans Union's lists are covered by the Act at all. See *Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974) (quoting *Ashwander v. TVA,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring)).

\*   \*   \*

Because the FTC has made sweeping and arbitrary inferences about the purposes for which the only data common to all of Trans Union's lists has been collected, we remand the case to the Commission for such further proceedings as the Commission may initiate consistent with this opinion, including exploration of the possible existence of empirical evidence to support what it has so far merely assumed.

*So ordered.*