TRANS UNION CORPORATION, Petitioner,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 00–1141.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 6, 2001.

Decided April 13, 2001.

---

**6.** To be sure, petitioner did not make this point very effectively.

Roger L. Longtin argued the cause for petitioner. With him on the brief was Stephen L. Agin.

Lawrence DeMille–Wagman, Attorney, Federal Trade Commission, argued the cause for respondent. With him on the brief were Debra A. Valentine, General Counsel, and John F. Daly, Assistant General Counsel.

Before: EDWARDS, Chief Judge, GINSBURG and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

Petitioner, a consumer reporting agency, sells lists of names and addresses to target marketers—companies and organizations that contact consumers with offers of products and services. The Federal Trade Commission determined that these lists were "consumer reports" under the Fair Credit Reporting Act and thus could no longer be sold for target marketing purposes. Challenging this determination, petitioner argues that the Commission's decision is unsupported by substantial evidence and that the Act itself is unconstitutional. Because we find both arguments without merit, we deny the petition for review.

I

Petitioner Trans Union sells two types of products. First, as a credit reporting agency, it compiles credit reports about individual consumers from credit information it collects from banks, credit card

companies, and other lenders. It then sells these credit reports to lenders, employers, and insurance companies. Trans Union receives credit information from lenders in the form of "tradelines." A tradeline typically includes a customer's name, address, date of birth, telephone number, Social Security number, account type, opening date of account, credit limit, account status, and payment history. Trans Union receives 1.4 to 1.6 billion records per month. The company's credit database contains information on 190 million adults.

Trans Union's second set of products—those at issue in this case—are known as target marketing products. These consist of lists of names and addresses of individuals who meet specific criteria such as possession of an auto loan, a department store credit card, or two or more mortgages. Marketers purchase these lists, then contact the individuals by mail or telephone to offer them goods and services. To create its target marketing lists, Trans Union maintains a database known as Master-File, a subset of its consumer credit database. MasterFile consists of information about every consumer in the company's credit database who has (A) at least two tradelines with activity during the previous six months, or (B) one tradeline with activity during the previous six months plus an address confirmed by an outside source. The company compiles target marketing lists by extracting from MasterFile the names and addresses of individuals with characteristics chosen by list purchasers. For example, a department store might buy a list of all individuals in a particular area code who have both a mortgage and a credit card with a $10,000 limit. Although target marketing lists contain only names and addresses, purchasers know that every person on a list has the characteristics they requested because Trans Union uses those characteristics as criteria for culling.

individual files from its database. Purchasers also know that every individual on a target marketing list satisfies the criteria for inclusion in MasterFile.

The Fair Credit Reporting Act of 1970 ("FCRA"), 15 U.S.C. §§ 1681, 1681a–1681u, regulates consumer reporting agencies like Trans Union, imposing various obligations to protect the privacy and accuracy of credit information. The Federal Trade Commission, acting pursuant to its authority to enforce the FCRA, *see* 15 U.S.C. § 1681s(a), determined that Trans Union's target marketing lists were "consumer reports" subject to the Act's limitations. The FCRA defines "consumer report" as:

> [A]ny written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for—
>
> (A) credit or insurance to be used primarily for personal, family, or household purposes;
>
> (B) employment purposes; or
>
> (C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1). Finding that the information Trans Union sold was "collected in whole or in part by [Trans Union] with the expectation that it would be used by credit grantors for the purpose of serving as a factor in establishing the consumer's eligibility for one of the transactions set forth in the FCRA," and concluding that target marketing is not an authorized use of consumer reports under section 1681b, *In re Trans Union Corp.*, 118

F.T.C. 821, 891 (1994), the Commission ordered Trans Union to stop selling target marketing lists, *id.* at 895.

Trans Union petitioned for review. In *Trans Union Corp. v. FTC*, 81 F.3d 228 (D.C.Cir.1996) (*"Trans Union I"*), we agreed with the Commission that selling consumer reports for target marketing violates the Act. *Id.* at 233–34. We nevertheless set aside the Commission's determination that Trans Union's target marketing lists amounted to consumer reports. *Id.* at 231–33. The Commission, we held, failed to justify its finding that Trans Union's lists, by conveying the mere fact that consumers had a tradeline, were communicating information collected for the purpose of determining credit eligibility. We found that the Commission had failed to provide evidence to support the proposition that "the mere existence of a tradeline, as distinguished from payment history organized thereunder," was used for credit-granting decisions or was intended or expected to be used for such decisions. *Id.* at 233. (The parties' arguments in *Trans Union I* and in the proceedings on remand focused on the relevance of the information in the company's lists to consumer eligibility for credit; accordingly, the information's relevance to the other uses the statute lists—such as determining eligibility for insurance and employment—are not at issue in this case. *See In re Trans Union Corp.,* Opinion of the Commission, No. 9255, slip op. at 16 n.20 (Feb. 10, 2000) (*"FTC Opinion"*).)

On remand, following extensive discovery, more than a month of trial proceedings, and an initial decision by an Administrative Law Judge, the Commission found that Trans Union's target marketing lists contain information that credit grantors use as factors in granting credit. Accordingly, the Commission concluded, the lists are "consumer reports" that Trans Union may not sell for target marketing purposes. *FTC Opinion* at 33. The Commission also rejected Trans Union's argument that such a restriction would violate its First Amendment rights. Applying intermediate scrutiny, the Commission found that the government has a substantial interest in protecting private credit information, that the FCRA directly advances that interest, and that the Act's restrictions on speech are narrowly tailored. *Id.* at 37–52. The Commission thus ordered Trans Union to "[c]ease and desist from distributing or selling consumer reports, including those in the form of target marketing lists, to any person unless [the company] has reason to believe that such person intends to use the consumer report for purposes authorized under Section [1681b] of the Fair Credit Reporting Act." *In re Trans Union Corp.,* Final Order, No. 9255 (Feb. 10, 2000). Trans Union again petitions for review.

## II

As we pointed out in *Trans Union I,* the first element of the FCRA's definition of consumer report—"bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living," 15 U.S.C. § 1681a(d)(1)—"does not seem very demanding," for almost any information about consumers arguably bears on their personal characteristics or mode of living. *See* 81 F.3d at 231. Indeed, Trans Union does not challenge the Commission's conclusion that the information contained in its lists meets this prong of the definition of consumer report.

Whether the company's target marketing lists qualify as consumer reports thus turns on whether information they contain "is used or expected to be used or collected in whole or in part for the purpose of

serving as a factor in establishing the consumer's eligibility for [credit]." 15 U.S.C. § 1681a(d)(1). According to the Commission, "a factor in establishing the consumer's eligibility for [credit]," *id.*, includes any type of information credit grantors use in their criteria for "prescreening" or in "credit scoring models." *See FTC Opinion* at 16–17. "Prescreening" involves selecting individuals for guaranteed offers of credit or insurance. *See id.* at 18; *see also Trans Union I*, 81 F.3d at 234 (defining "prescreening" as "the sale of a list of people preselected for credit worthiness by some specified criteria, where the buyer of the list agrees in advance to make a firm offer of credit to each listed person"). "Credit scoring models" are statistical models for predicting credit performance that are developed by observing the historical credit performance of a number of consumers and identifying the consumer characteristics that correlate with good and bad credit performance. *See FTC Opinion* at 17. Applying its prescreening/credit scoring model standard, the Commission found that Trans Union's lists contain the type of information " 'used' and/or 'expected to be used' . . . as a factor in establishing a consumer's eligibility for credit." *Id.* at 15; *see also id.* n. 19.

Trans Union urges us to reject the Commission's interpretation of the Act in order to avoid what the company calls "serious constitutional questions." Pet'r Opening Br. at 9. In support, it cites *DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council,* where the Supreme Court refused to defer to the NLRB's interpretation of a provision of the NLRA because the Court believed it raised serious First Amendment problems. 485 U.S. 568, 574–77, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). But as we demonstrate in Section III, *infra,* Trans Union's constitutional arguments are without merit, so we have no basis for rejecting the Commission's statutory interpretation on that ground.

■ Nor has Trans Union offered a basis for questioning the Commission's statutory interpretation on other grounds. The company does not mention the Commission's interpretation of the statute in the "Issues Presented For Review" section of its brief. *Cf.* FED. R.APP. P. 28(a)(5) (requiring that appellants' and petitioners' briefs state the issues presented for review). Although scattered language in the brief hints at a statutory interpretation challenge, that language appears in a section entitled "The Record Does Not Support The Conclusion Reached By The Commission." Trans Union has thus failed to put the Commission on notice that it faced a nonconstitutional challenge to its interpretation of the statute.

■ We have the same reaction to the brief's occasional suggestions that the Commission's decision was arbitrary and capricious. Not only do these suggestions appear in a section entitled "The Commission's Interpretation Of FCRA Raises Serious Constitutional Questions," *see, e.g.,* Pet'r Opening Br. at 19 (referring to "illogical contradictions"), but the list of issues presented for review neither mentions the arbitrary and capricious standard nor otherwise questions the reasonableness of the Commission's decision.

■ We thus turn to the one non-constitutional argument that Trans Union clearly mounts: that the Commission's decision is unsupported by substantial evidence. A footnote to the title of this portion of its brief states:

The Order is replete with statements unsupported by the evidence. . . . The word limitation of [Federal Rule of Appellate Procedure] 32(a)(7) makes it impossible to address each such misstate-

ment here. It is the responsibility of the Commission's counsel, however, to ensure that the Court is not misled by the statements in the Order not supported by the evidence.

*Id.* at 21 n. 7. To bring a substantial evidence challenge, however, Trans Union must do more than assert generally that the decision is unsupported by substantial evidence. It must identify the specific findings it challenges and demonstrate that each finding is either unsupported by evidence or, because the Commission unreasonably discounted contrary evidence, unsupported by "the record in its entirety." *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The 14,000 words permitted by Rule 32(a)(7) are more than enough to accomplish this task.

■ Instead of challenging the Commission's findings regarding specific target marketing products, Trans Union points to evidence relating to the general question of whether the information in its target marketing lists is used to determine credit worthiness. This is not the question before us. As we indicate above, the Commission interprets "factor in establishing the consumer's eligibility for credit," 15 U.S.C. § 1681a(d)(1), to include any information considered by lenders in prescreening, which, as two witnesses testified, can involve consideration of criteria other than credit worthiness, e.g., whether a given consumer is likely to respond to an offer of credit. Because Trans Union has not challenged the Commission's interpretation of the statute, its argument that the information the company sells is not actually used to determine credit worthiness is beside the point. Moreover, Trans Union cites no testimony refuting the Commission's finding that the information in its target marketing lists is used in prescreening.

Not only has Trans Union thus failed to mount a proper substantial evidence challenge to the Commission's finding that lenders take list information into account in credit models and prescreening, but we have no doubt that the decision does find support in the record. Consider, for example, Trans Union's "Master File/Selects" product line, which allows marketers to request lists based on any of five categories of information: (1) credit limits (e.g., consumers with credit cards with credit limits over $10,000), (2) open dates of loans (e.g., consumers who took out loans in the last six months), (3) number of tradelines, (4) type of tradeline (e.g., auto loan or mortgage), and (5) existence of a tradeline. The Commission cites testimony and other record evidence that support its finding that lenders consider each of these five categories of information in prescreening or credit scoring models. Beginning with credit limits, the Commission cites the testimony of a statistician who builds credit scoring models. *FTC Opinion* at 19. That witness explained that scoring models rely in part on consumer utilization of credit, calculated by dividing a consumer's current outstanding balance by the consumer's credit limit. To support its finding regarding open dates of loans, the Commission relied on the testimony of a vice president of a company that builds credit scoring models. *Id.* According to that witness, some scoring models use the open date of the oldest tradeline in a consumer's credit file as a predictive characteristic. The witness also testified that some credit scoring models use the date of the most recently opened tradeline to determine credit risk. To support its finding that information about the number of tradelines in a consumer's credit file is a consumer report, the Commission cites the testimony of a vice president in charge of direct mail processing for a bank's credit card department who explained that, in its

credit making decisions, her bank considers the number of tradelines consumers possess. *Id.* at 20 n. 30. The Commission also points to record evidence demonstrating that Trans Union itself uses the number of tradelines as a predictive characteristic in its credit scoring models. *Id.* at 20. As to the type of tradeline, the Commission cites the testimony of representatives of companies that design credit models who explained that some credit scoring models, including two used by Trans Union, take into account possession of a bank card. *FTC Opinion* at 21–22. One witness testified that Trans Union scoring models also consider possession of a finance company loan to be a predictive characteristic. Another witness, this one representing a credit card company, testified that his company's scoring models assign points for possession of a mortgage, retail tradeline, or bank card. *Id.* at 21.

■ The record also contains sufficient evidence to support the Commission's resolution of the issue remanded by *Trans Union I*: whether mere existence of a tradeline is "a factor in credit-granting decisions." 81 F.3d at 233. An employee of a bank that issues credit cards testified that to be eligible for credit, an individual must have at least one tradeline. *FTC Opinion* at 25. The vice president of credit scoring at another credit card issuer testified that the very first question her company asks in prescreening is whether the consumer has a tradeline that has been open for at least a year. Challenging the implications of this testimony, Trans Union argues that banks ask whether consumers have tradelines not because the existence of a tradeline is itself a factor in determining credit eligibility, but because banks want to determine whether there is enough information in consumer files to make credit eligibility determinations. This may be true. But as we explain

above, our task is limited to determining whether substantial record evidence supports the Commission's finding that banks consider the existence of a tradeline as a factor in prescreening or credit models. Because the record contains such evidence, we have no basis for questioning the Commission's decision.

Trans Union has identified one potentially troubling inconsistency in the Commission's decision. As the company points out, record evidence demonstrates that lenders consider names and addresses when prescreening consumers for guaranteed offers of credit, yet the Commission does not prohibit the sale of names and addresses for target marketing purposes. Regarding addresses, the Commission's opinion says, "[a]lthough some lenders will not extend credit to consumers with a P.O. Box address, we do not find that the P.O. Box feature bears on 'credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics or mode of living.'" *Id.* at 31 n. 50. It is not clear, however, why receiving mail at a post office should not be considered an aspect of an individual's "mode of living." We need not resolve this issue, however, because Trans Union presents neither an arbitrary and capricious nor a statutory interpretation challenge to the Commission's failure to prohibit the sale of names and addresses. *See supra* at 814–15.

Nor must we resolve any inconsistency between the Commission's decision in this case and a 1993 consent agreement between the Commission and a Trans Union competitor, TRW (now Experian). In contrast to the Commission's decision here, that agreement allowed TRW to sell information about consumers' ages to target marketers. Again, although this might suggest that the Commission has acted arbitrarily and capriciously in treating similarly situated entities differently, Trans

Union has not made such a challenge. The Commission thus seems correct that "[t]he TRW Consent is not before us in this matter and it is without precedential effect on this opinion." *FTC Opinion* at 16 n.22.

### III

Trans Union's constitutional challenge consists of two arguments. It claims first that the FCRA is vague, thus running afoul of the due process guarantee of the Fifth Amendment. Trans Union also argues that the statute violates the free speech guarantee of the First Amendment because it restricts the company's ability to disseminate information.

Beginning with the Fifth Amendment challenge, we are guided by *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). "[L]aws," the Court said, must not only "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited," but in order to prevent "arbitrary and discriminatory enforcement," they must also "provide explicit standards for those who apply them." *Id.* (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). Emphasizing that these principles should not "be mechanically applied," the Court held that "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action." *Id.* The "regulated enterprise," the Court added, "may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Id.* Finally, "the consequences of imprecision are qualitatively less severe" when laws have "scienter re-

quirement[s]" and "civil rather than criminal penalties." *Id.* at 499, 102 S.Ct. 1186.

■■ Applying this standard, we see no merit in Trans Union's vagueness argument. To begin with, because the FCRA's regulation of consumer reporting agencies is economic, it is subject to "a less strict vagueness test." *Id.* at 498, 102 S.Ct. 1186. Moreover, Trans Union has "the ability to clarify the meaning of the [FCRA]," *id.*, through the Commission's advisory opinion procedures. *See* 16 C.F.R. §§ 1.1–1.4 (establishing general procedures for obtaining advisory opinions); *id.* § 2.41(d) (establishing procedures for obtaining guidance regarding compliance with FTC orders). Selectively quoting from the Commission's regulations, the company disputes the usefulness of advisory opinions, suggesting that they can be changed at any time and that "the Commission expressly reserves the right upon rescission of an earlier opinion to commence an enforcement proceeding." Pet'r Reply Br. at 10. The relevant regulation states as follows (the sentences Trans Union omits are in italics):

Any advice given by the Commission is without prejudice to the right of the Commission to reconsider the questions involved and, where the public interest requires, to rescind or revoke the action. *Notice of such rescission or revocation will be given to the requesting party so that he may discontinue the course of action taken pursuant to the Commission's advice. The Commission will not proceed against the requesting party with respect to any action taken in good faith reliance upon the Commission's advice under this section, where all the relevant facts were fully, completely, and accurately presented to the Commission and where such action was promptly discontinued upon notifica-*

*tion of rescission or revocation of the Commission's approval.*

16 C.F.R. § 1.3(b) (emphasis added). Although the next subsection of the regulation states that "[a]dvice rendered by the staff is without prejudice to the right of the Commission later to rescind the advice and, where appropriate, to commence an enforcement proceeding," *id.* § 1.3(c), the portion of the regulation omitted by Trans Union makes quite clear that the company can safely rely on advisory opinions without fear of penalty should the Commission later change its mind.

The FCRA does not fit quite so comfortably under the other *Hoffman Estates* criteria. Although the Act does contain a clear scienter requirement for the imposition of civil fines, *see, e.g.,* 15 U.S.C. § 1681s(a)(2)(A) ("knowing"), it also provides that anyone who negligently violates the Act may be liable to injured consumers for actual damages. *Id.* § 1681o(a). The statute also authorizes criminal penalties. *Id.* § 1681r (providing for possible imprisonment for "[a]ny officer or employee of a consumer reporting agency who knowingly and willfully provides information concerning an individual from the agency's files to a person not authorized to receive that information"). Even given these distinctions, however, because of the extremely clear process for "clarify[ing] the meaning of the regulation," *Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186, Trans Union simply does not face a due process risk of prosecution for conduct it could not have known to be illegal.

■ Trans Union's First Amendment challenge fares no better. Banning the sale of target marketing lists, the company says, amounts to a restriction on its speech subject to strict scrutiny. Again, Trans Union misunderstands our standard of review. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749,

105 S.Ct. 2939, 86 L.Ed.2d 593 (1985), the Supreme Court held that a consumer reporting agency's credit report warranted reduced constitutional protection because it concerned "no public issue." *Id.* at 762, 105 S.Ct. 2939. "The protection to be accorded a particular credit report," the Court explained, "depends on whether the report's 'content, form, and context' indicate that it concerns a public matter." *Id.* n. 8, 105 S.Ct. 2939. Like the credit report in *Dun & Bradstreet,* which the Supreme Court found "was speech solely in the interest of the speaker and its specific business audience," *id.* at 762, 105 S.Ct. 2939, the information about individual consumers and their credit performance communicated by Trans Union target marketing lists is solely of interest to the company and its business customers and relates to no matter of public concern. Trans Union target marketing lists thus warrant "reduced constitutional protection." *Id.* n. 8, 105 S.Ct. 2939.

■ We turn then to the specifics of Trans Union's First Amendment argument. The company first claims that neither the FCRA nor the Commission's Order advances a substantial government interest. The "Congressional findings and statement of purpose" at the beginning of the FCRA state: "There is a need to insure that consumer reporting agencies exercise their grave responsibilities with ... respect for the consumer's right to privacy." 15 U.S.C. § 1681 (a)(4). Contrary to the company's assertions, we have no doubt that this interest—protecting the privacy of consumer credit information—is substantial.

■ Trans Union next argues that Congress should have chosen a "less burdensome alternative," i.e., allowing consumer reporting agencies to sell credit information as long as they notify consumers

and give them the ability to "opt out." Pet'r Opening Br. at 43–44. Because the FCRA is not subject to strict First Amendment scrutiny, however, Congress had no obligation to choose the least restrictive means of accomplishing its goal.

■ Finally, Trans Union argues that the FCRA is underinclusive because it applies only to consumer reporting agencies and not to other companies that sell consumer information. But given consumer reporting agencies' unique "access to a broad range of continually-updated, detailed information about millions of consumers' personal credit histories," *FTC Opinion* at 1, we think it not at all inappropriate for Congress to have singled out consumer reporting agencies for regulation. As we explained in *Blount v. SEC,* "a regulation is not fatally underinclusive simply because an alternative regulation, which would restrict *more* speech or the speech of *more* people, could be more effective." 61 F.3d 938, 946 (D.C.Cir.1995). The primary purpose of underinclusiveness analysis is to "ensure that the proffered state interest actually underlies the law, [so] a rule is struck for *under*inclusiveness only if it cannot fairly be said to advance any genuinely substantial governmental interest because it provides only ineffective or remote support for the asserted goals, or limited incremental support." *Id.* (internal citations omitted). To survive a First Amendment underinclusiveness challenge, therefore, "neither a perfect nor even the best available fit between means and ends is required." *Id.* The FCRA easily satisfies this standard.

Trans Union contends that the statute is underinclusive for another reason, i.e., because it allows the sale of consumer reports for the purpose of guaranteed offers of credit or insurance. *Trans Union I* disposes of this argument:

[B]eing singled out for a firm offer of credit is exactly the sort of thing the Act seeks to promote, and a purpose for which it is quite reasonable to infer the consumer's implicit waiver or consent. Moreover, prescreening and the guaranteed offers of credit it spawns can *only* take place through the use of consumer reports, whereas the use of credit data for non-credit-related mailings is at most helpful to those ends.

81 F.3d at 234.

### IV

Having considered and rejected Trans Union's other arguments, we deny the petition for review.

*So Ordered.*