**TRANS UNION CORPORATION,**
Petitioner,

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 00–1141.

United States Court of Appeals,
District of Columbia Circuit.

Filed Oct. 23, 2001.

Before: GINSBURG, Chief Judge, EDWARDS and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge TATEL.

TATEL, Circuit Judge:

■ In its petition for rehearing, Trans Union argues that we incorrectly applied *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759–60, 105 S.Ct. 2939, 2945–46, 86 L.Ed.2d 593 (1985), when we decided that target marketing lists merit only intermediate scrutiny. In *Dun & Bradstreet*, the Supreme Court held that a consumer reporting agency's wholly false credit report warranted only qualified constitutional protection because the report "concern[ed] no public issue." *Id.* at 762, 105 S.Ct. at 2946. In reaching that conclusion, the Court noted that the report constituted "speech solely in the individual interest of the speaker and its specific business audience," and that the report reached only "five subscribers, who, under the terms of the subscription agreement, could not distribute it further." *Id.* The same is true here: Trans Union's target marketing lists interest only Trans Union and its target marketing customers, and Trans Union sells its lists for one-time use, prohibiting purchasers from disseminating the data.

To be sure, Trans Union's lists are not "wholly false," as was the *Dun & Bradstreet* credit report, nor is the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, 1681a–1681u, an "incidental state regulation," as *Dun & Bradstreet* termed the state defamation law challenged in that case. 472 U.S. at 762, 105 S.Ct. at 2947. Nothing in *Dun & Bradstreet*, however, suggests that these two factors were critical to the Court's decision. The important point is that here, as in *Dun & Bradstreet*, the targeted speech solely interests the speaker (Trans Union) and its "specific business audience" (its customers). *Id.*

One additional consideration, absent in *Dun & Bradstreet*, supports our conclusion that Trans Union's target marketing lists comprise speech of purely private concern. The lists contain names of private individuals, not incorporated businesses like the respondent in *Dun & Bradstreet*. We do not suggest that corporations lack privacy interests, nor that all corporate speech is somehow inherently public. But the particular information at issue in this case—people's names, addresses, and financial circumstances—is less public than the same information about companies whose articles of incorporation and financial statements are generally available for inspection. *Cf. Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495, 95 S.Ct. 1029, 1046, 43 L.Ed.2d 328 (1975) ("By placing the information in the public domain . . ., the State must be presumed to have concluded that the public interest was thereby being served.").

In support of its argument that the FCRA's target marketing limitation merits strict scrutiny, Trans Union cites cases in

which the Supreme Court "struck down privacy-based restrictions on the publication of truthful information." Pet. at 5–6. Unlike this case, however, most of the cited cases involve speech on matters of public concern. *E.g., Bartnicki v. Vopper,* 532 U.S. 514, 121 S.Ct. 1753, 1765, 149 L.Ed.2d 787 (2001) (concluding that privacy concerns raised by disclosure of contents of private cellular telephone call "give way when balanced against the interest in publishing matters of public importance"); *Florida Star v. B.J.F.,* 491 U.S. 524, 533, 109 S.Ct. 2603, 2609, 105 L.Ed.2d 443 (1989) (holding that state may not punish publication of " 'lawfully obtain[ed] truthful information about a matter of public significance' " (quoting *Smith v. Daily Mail Publ'g Co.,* 443 U.S. 97, 103, 99 S.Ct. 2667, 2671, 61 L.Ed.2d 399 (1979))); *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982) (concluding that disclosure of names of civil rights boycott violators is "expression on public issues" and rests on "highest rung of the hierarchy of First Amendment values") (citations omitted); *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 839, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1 (1978) (deciding that state may not punish press for disclosing confidential judicial proceedings, in part because a "responsible press has always been regarded as the handmaiden of effective judicial administration") (citations omitted); *Cox Broad. Corp.,* 420 U.S. at 491–92, 95 S.Ct. at 1044–45 (noting that "[w]ith respect to judicial proceedings . . . the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice"). Another cited case involves speech addressed to a large, public audience. *Martin v. Struthers,* 319 U.S. 141, 146–47, 63 S.Ct. 862, 865, 87 L.Ed. 1313 (1943) (recognizing leafleting as central to public discourse because the

"[f]reedom to distribute information to every citizen . . . is . . . clearly vital to the preservation of a free society"). Finally, two cases concern commercial speech that—like the speech at issue here—merits only intermediate scrutiny. *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988) (lawyer advertising); *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) (pamphlets about contraceptives). Trans Union's reliance on these last two cases is particularly misplaced, for they stand not for the principle that speech rights "prevail" over privacy rights "virtually without exception," Pet. at 5, but instead for the principle that speech of largely private concern may warrant only qualified protection.

 Trans Union next argues that by permitting the sale of consumer reports to facilitate guaranteed offers of credit or insurance (prescreening), but prohibiting the sale of similar information to facilitate offers of other goods or services (target marketing), the FCRA makes a content-based distinction deserving strict scrutiny. The notion that content-based speech restrictions warrant strict scrutiny, however, derives from cases involving fully protected speech. *See, e.g., Arkansas Writers' Project, Inc. v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987) (striking down content-based sales tax on print media); *FCC v. League of Women Voters,* 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (striking down content-based law that forbade noncommercial educational broadcasting stations from editorializing). Trans Union's target marketing lists are private speech warranting only qualified constitutional protection. We need not now decide whether content-based restrictions of private speech might sometimes merit strict scrutiny. It is sufficient to note that given the Supreme Court's commercial speech doctrine, which creates a

category of speech defined by content but afforded only qualified protection, the fact that a restriction is content-based cannot alone trigger strict scrutiny. *See, e.g., City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) (applying intermediate scrutiny to determine constitutionality of Cincinnati rule banning handbill racks—but not newspaper racks—on public property).

■ In the alternative, Trans Union argues that the FCRA's target marketing restriction fails even intermediate scrutiny. Again, the cases the company cites are distinguishable: In *Edenfield v. Fane,* for example, the Supreme Court struck down a state rule prohibiting certified public accountants from personally soliciting new clients, partly because the state failed to establish that the rule would directly promote the state's interest in reducing fraud. 507 U.S. 761, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). Here, by contrast, the government cannot promote its interest (protection of personal financial data) except by regulating speech because the speech itself (dissemination of financial data) causes the very harm the government seeks to prevent. Thus, the FCRA unquestionably advances the identified state interest. For the same reason, unlike in *Greater New Orleans Broad. Ass'n, Inc. v. United States,* where the Court struck down a ban on casino advertising, in part because "practical and nonspeech-related forms of regulation ... could more directly and effectively" advance the government's interest in reducing casino gambling, 527 U.S. 173, 192, 119 S.Ct. 1923, 1934, 144 L.Ed.2d 161 (1999), here there is no possibility that some less-restrictive or nonspeech-related regulation could achieve the identified state interest. *See also Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995) (striking down pro-

hibition on beer labels that identify alcohol content, in part because government interest in preventing brewers from competing on basis of alcohol content could be advanced through less-restrictive regulations); *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 507, 116 S.Ct. 1495, 1510, 184 L.Ed.2d 711 (1996) (invalidating Rhode Island's ban on advertising of retail prices of alcoholic beverages because "alternative forms of regulation that would not involve any restriction on speech ... would be more likely to achieve the State's goal of promoting temperance"). Finally, also unlike in *Greater New Orleans Broad. Ass'n,* where the challenged statute was "pierced by exemptions and inconsistencies," 527 U.S. at 190, 119 S.Ct. at 1933, here we confront a law with just one exception: the permissive standard applied to information sold for prescreening.

Nothing in *Lorillard Tobacco Co. v. Reilly,* — U.S. ——, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001), issued after publication of our opinion, requires a different result. In that case, the Supreme Court struck down Massachusetts regulations governing advertising of various tobacco products, largely because the sheer breadth of the regulations raised questions about the fit between the regulations' means (restricting advertising) and ends (preventing underage tobacco use). *Id.* at 2425. *Lorillard* noted several ways in which the "breadth and scope of the regulations" evidenced that Massachusetts had not performed "a careful calculation of the speech interests involved." *Id.* For example, the regulations failed to target "advertising and promotion practices that appeal to youth," encompassing instead all forms of communication, and even restricting a retailer's ability to "answer inquiries [from adults] about its tobacco products." *Id.* at 2426. No similar problem exists here. Aiming directly at its intended target, *supra,* the FCRA has neither indirect

nor unintended effects on speech. The statute therefore sweeps only as broadly as necessary to accomplish its goal: protecting the privacy of personal financial information. A narrower restriction would immediately lead to increased disclosure of such information. The FCRA's means and ends are thus one, leaving no possibility of a careless or imperfect "fit."

■ As for Trans Union's suggestion that Congress should have adopted an opt-out scheme, we note that Congress considered such a scheme, S. REP. 104–185, at 36–38 (1995); H.R. REP. 102–692, at 25–27 (1992), but settled on an opt-in scheme instead, 15 U.S.C. § 1681b(a)(2). As enacted, therefore, the statute permits Trans Union to sell a consumer's private information as long as the consumer consents. Although the opt-in scheme may limit more Trans Union speech than would the opt-out scheme the company prefers, intermediate scrutiny does not obligate courts to invalidate a "remedial scheme because some alternative solution is marginally less intrusive on a speaker's First Amendment interests." *Turner Broad. System, Inc. v. FCC,* 520 U.S. 180, 217–18, 117 S.Ct. 1174, 1200, 137 L.Ed.2d 369 (1997) (citations omitted). "So long as the means chosen are not substantially broader than necessary to achieve the government's interest, . . . [a] regulation [is] not . . . invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 218, 117 S.Ct. at 1200 (citations omitted).

Trans Union also argues that the FCRA's permissive treatment of information sold for prescreening "illustrate[s] . . . [t]he [statute's] lack of narrow tailoring." Trans Union's Supp. Br. at 4. On the contrary, the statute's differential treatment of information sold for prescreening and that sold for target marketing recog-

nizes that individuals' privacy interests in personal information are not absolute: Such interests are defined not only by the content of the information, but also by the identity of the audience and the use to which the information may be put. For example, people who fiercely protect the privacy of personal medical information may nevertheless disclose such information on job or medical insurance applications. People who protect the privacy of their salaries may nevertheless reveal how much they make to qualify for a mortgage. So too, here. Congress apparently believes that people are more willing to reveal personal information in return for guaranteed offers of credit than for catalogs and sales pitches. Given the nature of intermediate scrutiny, it can hardly be said that the First Amendment prohibits Congress from balancing privacy interests differently in these different circumstances—particularly since the FCRA's express purpose is to facilitate credit, not target marketing.

■■ Nor does the FCRA's permissive treatment of information sold for prescreening demonstrate, as Trans Union argues, that the statute is unconstitutionally underinclusive. " '[A] regulation is not fatally underinclusive simply because an alternative regulation, which would restrict more speech or the speech of more people, could be more effective.' " *Trans Union v. FTC,* 245 F.3d 809, 819 (D.C.Cir.2001) (quoting *Blount v. SEC,* 61 F.3d 938, 946 (D.C.Cir.1995)). Underinclusiveness analysis "ensure[s] that the proffered state interest actually underlies the law, [so] a rule is struck for *under*inclusiveness only if it cannot fairly be said to advance any genuinely substantial governmental interest." *Blount,* 61 F.3d at 946 (citations omitted). To survive a First Amendment underinclusiveness challenge, therefore, "neither a perfect nor even the best avail-

able fit between means and ends is required." *Id.* The FCRA satisfies this standard.

■ Finally, Trans Union argues that we erred by declining to consider its statutory interpretation and arbitrary and capricious claims. We explained, however, that Trans Union's briefs fell far short of this Circuit's requirements for presenting issues for decision. *Trans Union v. FTC,* 245 F.3d at 814. To be sure, the briefs attempted statutory claims, *id.* (discussing petitioner's briefs), and we had discretion to consider them. *Cf. Public Citizen Health Research Group v. FDA,* 185 F.3d 898, 903 n. * (D.C.Cir.1999). But because of the utter incoherence of Trans Union's briefs, and because we discerned no substantial constitutional issue, *cf. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress."), we chose not to address those claims. Since Trans Union's petition for rehearing merely clarifies arguments the company's briefs had muddied, instead of restating arguments claimed to have been overlooked or misunderstood, the petition comes too late.

The petition for rehearing is denied.

*So ordered.*

On Petition for Review of an Order of the Federal Trade Commission

### ORDER

**Per Curiam**

Upon consideration of Petitioner's petition for rehearing filed May 25, 2001, and of the opposition thereto, it is

ORDERED that the petition be denied, as is more fully set forth in the opinion of the court filed herein this date.