The CITY OF TIPP CITY, Appellee,

v.

DAKIN et al., Appellants.

[Cite as *Tipp City v. Dakin*, 186 Ohio App.3d 558, 2010-Ohio-1013.]

Court of Appeals of Ohio,
Second District, Miami County.

No. 09–CA–06.

Decided Feb. 26, 2010.

564

Surdyk Dowd & Turner Co., L.P.A., Robert J. Surdyk, and Kevin A. Lantz; and Moore & Associates, Joseph P. Moore, and David J. Caldwell, for appellee.

Faust, Harrelson, Fulker, McCarthy & Schlemmer, L.L.P., and Robert M. Harrelson; Dinsmore & Shohl, L.L.P., and Jeremy S. Rogers, for appellants.

BROGAN, Judge.

{¶ 1} Appellants, Michael F. Dakin, Warrior Racing, Inc., Indian Creek Properties, L.L.C., and Indian Creek Fabricators, Inc., appeal from the trial court's order granting appellee Tipp City a permanent injunction prohibiting the display of a mural on the wall of their building.

{¶ 2} Tipp City brought this action against appellants on July 5, 2007, claiming that the mural violated its sign ordinance, Tipp City Code of Ordinances ("T.C.C.") 154.090 et seq. On August 20, 2007, the appellants counterclaimed for declaratory and injunctive relief under Section 1983, Title 42, U.S.Code, arguing that the sign ordinance and Tipp City's enforcement of it against the mural violate the First Amendment.

{¶ 3} On July 31, 2008, the appellants moved for summary judgment. Tipp City filed a cross-motion for summary judgment on September 5, 2008. On November 25, 2008, the trial court entered an order consisting of 14 conclusions of law, finding unspecified portions of the sign ordinance unconstitutional while finding other portions severable and enforceable against the appellants' mural. This appeal followed.

## I. Factual and Procedural Background

{¶ 4} In December 2006, the appellants asked Josh Florie, a graphic artist, to paint a mural on the east facade of their business located at 38 Weller Drive in Tipp City, Ohio. The mural depicts a "mad scientist" holding a beaker. The

mural features a caricature of a bushy-browed chemist, wearing goggles and a lab coat, shrieking with excitement as his chemical creation explodes out of the beaker in his hand. Tipp City sought to ban the mural as a "sign" under the sign ordinance based on the appellants' failure to obtain a permit and to conform to the ordinance's other restrictions.

{¶ 5} The sign ordinance at issue prohibits various kinds of signs in the city and also contains numerous provisions concerning the content, design, size, and location of signs that are permitted. The stated purpose of the sign ordinance is "to protect the general health, safety, morals and welfare of the community by providing an instrument for protecting the physical appearance of the community and for encouraging high quality, effective outdoor graphics for the purpose of navigation, information and identification." The sign ordinance further states that its intent is "to provide businesses in the municipality with equitable sign standards in accord with fair competition and aesthetic standards acceptable to the community, to provide the public with safe and effective means of locating businesses, services and points of interest within the municipality, and to provide for a safe vehicular and pedestrian traffic environment." T.C.C. 154.090.

{¶ 6} The sign ordinance defines a "sign" in these terms:

{¶ 7} "A sign is defined as any name, number, symbol, identification, description, display, illustration, object, graphic, sign structure, or part thereof, whether permanent or temporary, which is affixed to, *painted on,* represented directly or indirectly upon or projected onto a building, structure, lot, or other device, whether mobile or affixed to the ground, and which directs attention to any object, product, place, activity, person, institution, organization, or business. This definition includes all signs visible from any public right-of-way or adjacent property, including interior signs oriented toward the exterior facade of any building or structure as well as back-lighted translucent panels or strip lighting affixed to any wall or roof where such panels or lighting serves to identify and attract attention rather than illuminate space for human activity." (Emphasis added.) T.C.C. 154.092.

{¶ 8} Tipp City claimed that prior to painting the mural or otherwise altering it, the appellants were required under T.C.C. 154.093 to obtain a sign permit. Section 154.093 of the sign ordinance provides:

{¶ 9} "No person shall locate or retain a sign, or cause a sign to be located, relocated, altered, modified, or retained unless all provisions of this subchapter have been met. To ensure compliance with these regulations, a sign permit shall be secured from the Zoning Administrator or designee for each sign unless such sign is specifically exempted in this subchapter."

{¶ 10} To obtain a permit, the sign ordinance provides that anyone wishing to put up a sign must pay a permit fee for each sign requested. T.C.C. 154.094(A). An applicant also must submit scaled elevation drawings of the proposed sign. T.C.C. 154.094(B). The applicant must submit a site plan showing the location of the proposed sign and all adjacent buildings or other structures, and the lot itself, including the dimensions of all buildings, structures and lots. T.C.C. 154.094(D). All signs placed on a wall must also include a building elevation drawn to scale showing the proposed sign. T.C.C. 154.094(E).

{¶ 11} No permit application, related materials, or fee is required for certain signs, which may be displayed without prior approval from Tipp City. Twenty-four different kinds of "signs" may be displayed without a permit, permit fee, or permit application. T.C.C. 154.098. These include, among other things, national, state, city, or corporate flags; yard-sale signs; political signs; residential and commercial real estate signs; barber poles; open house signs; security system signs; government-sponsored signs; city banners promoting community events; and historical society signs. Id

{¶ 12} In addition to exempting certain signs from the requirements associated with seeking a permit, the sign ordinance imposes different substantive requirements for the content, design, and placement of signs. For example, signs for ATMs and banners for community events are not permitted to utilize more than three colors. T.C.C. 154.101(G) and 154.098(E). The use of more than five colors on most signs is forbidden, while signs advertising seasonal businesses may have only four. T.C.C. 154.099(C)(3) and 154.101(I).

{¶ 13} Similarly, the ordinance imposes a host of different size limitations for signs. A garage-sale or yard-sale sign may not exceed four square feet, a public information sign is limited to three square feet, political signs may be 32 square feet, residential for-sale signs may be seven square feet, commercial for-sale signs may be 16 or 32 square feet depending upon street frontage, window display signs may be six square feet, informational window signs may be two square feet, and scoreboards may be 100 square feet. T.C.C. 154.098. Signs promoting the development of land, facilities or structures may be 32 square feet, development entry signs may be 20 square feet, model home signs may be eight square feet, and seasonal business signs and drive-through menu-board signs may be 32 square feet. T.C.C. 154.101. A wall sign for a daycare or church may be no more than 20 square feet, which is less than half the maximum size allowed for a professional office (50 square feet), and only a quarter of the size allowed for a bank or restaurant (80 square feet). T.C.C. 154.100(A)(3) (incorporating Appendix F of the sign ordinance).

{¶ 14} The ordinance also imposes lighting, graphic-design, and placement restrictions on "signs." T.C.C. 154.098; see also T.C.C. 154.101. For example, a

banner is permitted only if it promotes a special event or the grand opening of a business. T.C.C. 154.101(B). Signs promoting model homes may be illuminated, but not internally illuminated. T.C.C. 154.101(F). Signs bearing a political message may not be illuminated at all. T.C.C. 154.098. Gas stations may post signs on their motor fuel pumps, but the signs—except ones that other laws require to be posted—may identify only the brand name, logo, or type of fuel sold. T.C.C. 154.101(J)(3).

{¶ 15} The sign ordinance prohibits a number of types of "signs or similar devices":

{¶ 16} "Off-premise signs, trailer signs, search lights, laser lights, pennants, streamers, spinners, bench signs, portable signs, roof signs, billboards, gas-inflatable signs, changeable copy signs except for gasoline station price signs and drive-thru menu boards under § 154.101(J) and (L), flashing signs, projected images and animated signs, any sign which utilizes illumination by means of bare bulbs or flame or both, signs with moving or moveable parts, and any look-alike version of any of these prohibited sign types." T.C.C. 154.095. This list of prohibited signs contains some exemptions. For example, signs containing gas station prices or drive-through menus may use changeable copy, but other signs may not. Id.

{¶ 17} On July 31, 2008, the appellants filed a motion for summary judgment, arguing that the sign ordinance violated their First Amendment rights and could not be enforced. On August 4, 2008, Tipp City repealed the entire sign ordinance and adopted a new one in its place. Tipp City then responded to the motion for summary judgment, noting that the new ordinance had removed some of the "perceived content-based restrictions" found in the former sign ordinance. But Tipp City did not seek enforcement under its new ordinance. Instead, it sought to enjoin the appellants' mural pursuant to the former ordinance.

{¶ 18} On November 25, 2008, the trial court found that the appellants' mural related to the "Warrior Racing" business, that it included more than five colors, and that the appellants had not applied for or obtained a permit prior to displaying the mural. The trial court held that the mural constituted commercial speech. It further held that four sections of the former sign ordinance were applicable to the appellants' mural and passed constitutional muster under an intermediate-scrutiny standard. Specifically, the trial court found that the mural qualified as a "sign" under the former ordinance and that the ordinance's permit, color, and size requirements were constitutional. The trial court additionally found that the appellants had standing to challenge the sign ordinance, both as applied to their mural and facially under the overbreadth doctrine. The trial court also determined that the appellants' challenge to the former sign ordinance was not mooted by its repeal and the subsequent enactment of the new ordinance.

{¶ 19} In its ruling, the trial court first examined whether the sign ordinance was facially overbroad. It concluded as follows:

{¶ 20} "The Court finds that portions of the former ordinance unconstitutionally restrict commercial and noncommercial speech on the basis of content because 'whether, where, when, and how signs may be erected and maintained differ according to the sign's content-based use type.' Therefore, the former ordinance must pass the strict scrutiny test. Under this test the city has the burden to prove that the ordinance is (1) narrowly tailored, to serve (2) a compelling state interest * * *. The city has failed to satisfy either prong of this test * * *."

{¶ 21} In reaching the foregoing conclusion, the trial court ruled that the aesthetic and traffic-safety concerns underlying the sign ordinance were not compelling state interests and therefore could not satisfy the strict scrutiny required by the First Amendment for the ordinance's content-based distinctions. The trial court also found that certain content-based distinctions were not narrowly tailored enough to survive strict scrutiny. The trial court did not state with specificity, however, which provisions it found unconstitutional.

{¶ 22} The trial court further ruled that parts of the sign ordinance "are an impermissible prior restraint of speech according to classifications based on content as alleged." It stated:

{¶ 23} "[D]ue to content-based classifications, some provisions of the former ordinance do constitute an unconstitutional prior restraint on First Amendment rights as alleged. This is based on the unbridled discretion which necessarily is employed when attempting to categorize and differentiate signs on the basis of content."

{¶ 24} Without identifying the specific provisions it found unconstitutional, the trial court proceeded to the issue of severability. It essentially "severed in" four provisions, which it found to be constitutional and pertinent to the appellants' mural: (1) the definition of a sign, (2) a permit requirement for certain signs, (3) a five-color limit, and (4) a size limit for wall signs. The trial court determined that the appellants did not obtain a permit for their mural and that the mural exceeded the sign ordinance's color and size limits. Accordingly, the trial court granted Tipp City an injunction preventing the appellants from displaying the mural. At the same time, the trial court denied the appellants declaratory and injunctive relief to prevent Tipp City from enforcing the ordinance.

## II. Analysis

{¶ 25} In their sole assignment of error, the appellants contend that the trial court erred in granting Tipp City's motion for summary judgment and in denying their motion for similar relief. The appellants raise a variety of arguments. Initially, they claim that Tipp City's sign ordinance imposes content-based

restrictions on commercial and noncommercial speech and that the city cannot justify the content-based restrictions under either prong of the strict-scrutiny test.[1] They maintain that the trial court erred in not striking the ordinance in its entirety as unconstitutionally overbroad. They also contend that the trial court erred in finding that their mural is commercial speech and not subject to the same protection as noncommercial speech regulated by the ordinance. They argue that the mural was protected noncommercial speech, and even assuming it was commercial speech that the ordinance should be stricken as substantially overbroad. The appellants insist that the mural bears no relation to their business. They claim that it does not contain the name or logo of their business, "Warrior Racing," and does not depict, promote, or advertise any product or service sold or provided by them. The appellants also assert that the mural neither proposes a commercial transaction nor relates to the economic interest of them or their audience. They insist that the mural is not relegated to the subordinate constitutional protection afforded commercial speech simply because it is located on a commercial building and may, under a series of tenuous inferences, bear an arguable connection to one of the products they offer. They maintain that the mural is artistic expression subject to the highest First Amendment protection.

{¶ 26} Tipp City advances several arguments in response. First, it contends that the appellants lack standing to bring an overbreadth challenge to every provision in the sign ordinance. Instead, Tipp City contends that the appellants may challenge only the four provisions that the trial court found applicable to the mural. Tipp City asks us to limit the appellants' overbreadth standing to those provisions. Second, Tipp City stresses that it has repealed the sign ordinance in effect when the appellants painted their mural and has passed a new one. Tipp City asserts that this new ordinance "amended out" of the former sign ordinance many of the provisions about which the appellants complain. Third, Tipp City insists that the portions of the sign ordinance applicable to the appellants' mural are content-neutral time, place, and manner restrictions. Fourth, Tipp City asserts that the trial court properly severed allegedly unconstitutional portions of the sign ordinance and applied the remaining portions to the appellants' mural.

{¶ 27} Having examined the parties' arguments, we turn to our own analysis of Tipp City's regulation of the appellants' mural. To resolve the issues before us, we have considered the cases cited by the parties and reviewed numerous other sign-regulation cases—only a relatively small number of which are cited in this opinion. The results of our research lead us to concur in one federal district

---

1. Unless specifically indicated otherwise, all references to the "sign ordinance" or "ordinance" pertain to the now repealed ordinance that Tipp City is attempting to enforce against the appellants' mural.

court's assessment that "[i]t is truly a Herculean task to wade through the mire of First Amendment opinions to ascertain the state of the law relating to sign regulations." *Granite State Outdoor Advertising, Inc. v. Clearwater* (M.D.Fla. 2002), 213 F.Supp.2d 1312, 1327, affirmed in part and reversed in part (C.A.11, 2003), 351 F.3d 1112. The answers to some of the questions before us are not easy, despite the seemingly straightforward nature of the issues, and the conclusions drawn by different courts appear inconsistent at times. Be that as it may, the present dispute, which comes before us on undisputed material facts, compels us to "wade through the mire" to pass judgment on the constitutionality of Tipp City's sign ordinance.

{¶ 28} We begin the journey by addressing certain threshold determinations necessary to frame the remainder of our analysis. The first of these requires us to determine which sign ordinance applies to the appellants' mural: the sign ordinance in effect when the appellants painted it or the new ordinance that Tipp City passed later. The trial court found that the former ordinance applied, noting that Ohio law "prohibits enforcement of retroactive zoning ordinances." We raise this issue only because Tipp City continues to stress on appeal that it has amended the former ordinance to remedy the perceived constitutional infirmities. Tipp City does not appear seriously to dispute, however, that the applicable ordinance, for present purposes, is the one in effect when the appellants painted their mural. Indeed, R.C. 713.15 prohibits retroactive zoning ordinances other than those enacted to abate a preexisting use that has been declared a nuisance. See, e.g., *N. Ohio Sign Contrs. Assn. v. Lakewood* (1987), 32 Ohio St.3d 316, 319–320, 513 N.E.2d 324. Nothing before us reflects that the appellants' mural has been declared a nuisance. We note, too, that Tipp City itself seeks enforcement of the former sign ordinance and not the recently enacted one. Thus, our analysis will address the former sign ordinance.

{¶ 29} The second threshold issue concerns which parts of that sign ordinance are before us. As set forth above, the trial court found parts of the ordinance unconstitutional and severed the infirm provisions from four provisions that it found constitutional and applicable to the appellants. Tipp City has not cross-appealed from the trial court's judgment that parts of the sign ordinance are unconstitutional.[2] Therefore, we have no occasion to decide whether the trial court erred in reaching this conclusion. See App.R. 3(C)(1) ("A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order * * * shall file a notice of

---

2. The trial court determined that "four relevant constitutional sections are severable from the unconstitutional provisions." Unfortunately, it is not clear from the trial court's ruling whether it believed the entire sign ordinance to be unconstitutional except for the provisions it applied to the appellants' mural.

cross appeal * * *"). For present purposes, then, we accept as correct the trial court's determination that parts of the sign ordinance are unconstitutional.

{¶ 30} In light of the foregoing determinations, the narrower issue presented is whether the trial court properly found four parts of the sign ordinance to be constitutional, severable, and applicable to the appellants. As noted above, those four provisions define a "sign" and impose permit requirements, color limits, and size restrictions. To evaluate the constitutionality of these provisions, we first must determine whether the appellants' mural constitutes commercial or noncommercial speech. Resolution of this issue is necessary because, as will be seen below, it guides much of the remainder of our analysis.

{¶ 31} Despite the straightforward nature of the issue, determining whether the appellants' mural constitutes commercial speech is not without difficulty. Part of the problem stems from the difficulty in defining "commercial speech." One scholar has noted that "there is, arguably, a complete lack of a standard by which to evaluate [the] distinction" between commercial and noncommercial speech. Darrel Menthe, Writing on the Wall: The Impending Demise of Modern Sign Regulation Under the First Amendment & State Constitutions, 18 Geo.Mason U.Civ.Rts.L.J. (Fall 2007) 1, 26. In its most recognizable form, however, commercial speech "usually [is] defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.* (2001), 533 U.S. 405, 409, 121 S.Ct. 2334, 150 L.Ed.2d 438. The United States Supreme Court also has defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm. of New York* (1980), 447 U.S. 557, 561, 100 S.Ct. 2343, 65 L.Ed.2d 341. For present purposes, we accept these widely adopted definitions.

{¶ 32} A second problem involves the inherent difficulty in recognizing "commercial speech" under any definition. "The distinction between commercial and non-commercial speech was never obvious, and sophisticated advertising techniques can blur the lines even more." Menthe, Writing on the Wall, at 6; see also *Cincinnati v. Discovery Network, Inc.* (1993), 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (recognizing "the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category"); *Lorillard Tobacco Co. v. Reilly* (2001), 533 U.S. 525, 574–575, 121 S.Ct. 2404, 150 L.Ed.2d 532 (Thomas, J., dissenting) (doubting "whether it is even possible to draw a coherent distinction between commercial and non-commercial speech"). In the present case, for example, does a vibrant mural depicting a mad scientist do *anything more* than propose a commercial transaction, or, for that matter, does it propose a commercial transaction at all? By categorizing the mural as commercial speech, the trial court concluded that it did not do anything more than propose a commercial

transaction. The trial court stressed that the mural existed on the entire side of a commercial building, directed substantial attention to the appellants' business overlooking a parking lot and interstate highway, and related to one of the purposes of the business—presumably the sale of chemical fuel additives for race cars.

{¶ 33} Under the commercial-speech definitions set forth above, the crucial inquiry is whether the expression depicted in the appellants' mural either extends beyond proposing a commercial transaction or relates to something more than the economic interests of the appellants and their customers. If so, it qualifies as noncommercial speech and is entitled to stronger First Amendment protection. Although the issue is perhaps a close one, we conclude, on the undisputed facts before us, that the trial court did not err in its determination that the mural constitutes commercial speech. The mural depicts a mad scientist with an exploding beaker of chemicals, along with multicolored circular bubbles or chemical molecules. The mural originally included the chemical formula for nitromethane, a fuel used in competitive drag racing. After the present dispute arose, the appellants painted over the chemical formula. In any event, the business inside the building at issue, Warrior Racing, holds itself out as a refilling station for nitrous oxide, a known racing fuel or additive. The sign plainly is intended to attract attention to Warrior Racing, which directly relates to that company's economic interests. Additionally, we agree with Tipp City's assertion that "[i]t is not an attenuated interpretation of the sign, especially when coupled with the permitted exterior sign that reads, 'Warrior Racing,' that the chemicals and molecules depicted on the sign propose a commercial transaction to racing aficionados and others." Despite the appellant's assertions to the contrary, we are unconvinced that the mural does anything more.[3]

{¶ 34} Having determined that the mural is commercial speech, we turn next to the appellants' constitutional challenges to the sign ordinance. Insofar as the appellants contend that application of the ordinance to their mural is unconstitutional, the pertinent standard is found in *Cent. Hudson*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341. The *Cent. Hudson* test imposes a form of intermediate scrutiny applicable to commercial speech. It considers (1) whether

---

3. Assuming, arguendo, that we are wrong and that the appellants' mural is noncommercial speech, we note that the outcome in this case would remain the same. Our ultimate conclusion, infra, is that Tipp City's sign ordinance cannot be enforced against the appellants' mural. Although our analysis would change somewhat if the mural qualified as noncommercial speech, Tipp City would not benefit at all because noncommercial speech enjoys *greater* First Amendment protection than commercial speech. *Metromedia, Inc. v. San Diego* (1981), 453 U.S. 490, 513, 101 S.Ct. 2882, 69 L.Ed.2d 800. If the sign ordinance cannot be enforced against a mural displaying commercial speech, it surely cannot be enforced against the same mural displaying noncommercial speech.

the regulated commercial speech concerns a lawful activity and is not misleading; (2) whether the restriction seeks to implement a substantial governmental interest; (3) whether the restriction directly advances that interest; and (4) whether the restriction is no more extensive than is necessary to achieve that interest.[4] Id. at 557, 100 S.Ct. 2343, 65 L.Ed.2d 341.

{¶ 35} We conclude that the *Cent. Hudson* test is satisfied here. Tipp City makes no argument that the mad-scientist mural concerns unlawful activity or misleads the public. Moreover, Tipp City's sign ordinance is intended to promote traffic safety and aesthetics. These are substantial governmental interests. *Metromedia, Inc. v. San Diego* (1981), 453 U.S. 490, 507–508, 101 S.Ct. 2882, 69 L.Ed.2d 800. The closer questions are whether the four sign-ordinance provisions at issue directly advance Tipp City's interests and whether the restrictions are more extensive than necessary to achieve those interests.

{¶ 36} The first of the four provisions defines a "sign" as, inter alia, a display, illustration, or graphic that is painted on a building and that directs attention to the building. T.C.C. 154.092. Thus, the appellants' mural qualifies as a "sign" under the ordinance, and we see nothing unconstitutional about the foregoing definition. The appellants' mural also meets the definition of a "wall sign," which is a particular type of "sign" under Tipp City's ordinance. A "wall sign" is defined as "[a]ny sign attached to, painted on, or erected against the inside or outside wall of a building or structure, with the exposed display surface of the sign in a plane parallel to the plane of the building or structure and extending less than 14 inches from the building or structure." T.C.C. 154.092. Once again, we see no constitutional problem with this definition.

---

4. For purposes of the appellants' "as applied" challenge, we need not dwell on the parties' dispute about whether the sign ordinance's various requirements are "content neutral" or "content based." Because the appellants' mural is commercial speech, the *Cent. Hudson* test, which involves intermediate scrutiny, applies regardless of whether the ordinance's requirements are content based. See, e.g., *XXL of Ohio, Inc. v. Broadview Hts.* (N.D.Ohio 2004), 341 F.Supp.2d 765; *IMS Health Inc. v. Ayotte* (C.A.1, 2008), 550 F.3d 42, 83, fn. 47 ("Content-based restrictions on commercial speech are subject only to intermediate scrutiny"); *Trans Union Corp. v. F.T.C.* (D.C.Cir.2001), 347 U.S.App.D.C. 376, 267 F.3d 1138, 1141–1142 ("It is sufficient to note that given the Supreme Court's commercial speech doctrine, which creates a category of speech defined by content but afforded only qualified protection, the fact that a restriction is content-based cannot alone trigger strict scrutiny"); Ashutosh Bhagwat, The Test that Ate Everything: Intermediate Scrutiny in First Amendment Jurisprudence (2007) 2007 U.I.ll.L.Rev. 783, 794 ("Commercial speech regulations, however, may be, and generally are, content-based, but because of the lower constitutional value of such speech, only intermediate scrutiny applies"); *MD II Entertainment, Inc. v. Dallas* (C.A.5, 1994), 28 F.3d 492, 495 ("Of course, it is undisputed that *Central Hudson* continues to govern content-neutral regulations of commercial speech"). As we will discuss more fully infra, the distinction between content-neutral and content-based restrictions becomes more important in our analysis of the appellants' facial overbreadth challenge to the sign ordinance.

{¶ 37} The second of the four provisions requires a permit for all signs other than those specifically exempted. T.C.C. 154.093. The sign ordinance then identifies 24 categories of permit-exempt signs. T.C.C. 154.098. Where a sign ordinance is rife with exceptions, it runs the risk of not sufficiently advancing a municipality's interests in aesthetics and traffic safety. *Clear Channel Outdoor, Inc. v. New York,* (S.D.N.Y.2009), 608 F.Supp.2d 477, 497–502. On the other hand, a municipal ordinance need not apply uniformly to all signs—a degree of underinclusivity is permitted. *Metromedia,* 453 U.S. at 511–512, 101 S.Ct. 2882, 69 L.Ed.2d 800 (determining that a city could allow some billboards while rejecting others even though the effect on traffic safety and aesthetics was the same, provided the distinction was reasonable). Despite the exemptions in the sign ordinance, the permit requirement sufficiently advances Tipp City's interests in traffic safety and aesthetics. In our view, Tipp City reasonably could have concluded that a wall sign, such as the appellants' mural, potentially posed a greater threat to aesthetics and safety than many of the signs exempted from its permit requirement and, therefore, needed to be regulated. Finally, we do not believe that the permit requirement is more extensive than necessary to achieve Tipp City's interests. Despite its assertion that a regulation must be no more extensive than necessary to achieve the government's interest, *Cent. Hudson* does not require adoption of the absolutely least restrictive means. All that is required is a "reasonable" fit between the government's regulation and its asserted interest. *Greater New Orleans Broadcasting Assn., Inc. v. United States* (1999), 527 U.S. 173, 188, 119 S.Ct. 1923, 144 L.Ed.2d 161. In the present case, Tipp City's permit requirement is sufficiently tailored to prevent uncontrolled sign proliferation and to assure compliance with the sign ordinance's substantive requirements. The fit between the permit requirement and Tipp City's asserted interests is a reasonable one.

{¶ 38} We reach the same conclusions with regard to the third and fourth provisions at issue. The third provision imposes color limits. It provides: "Signs shall be limited to five colors, including black and white. The background color is considered 1 of the 5 permissible colors, unless channel letters are used, in which case the background is not [to] be considered 1 of the 5 permissible colors." T.C.C. 154.099(C)(3). As applied to the appellants' mural, we believe the color limit directly advances Tipp City's interests in aesthetics and traffic safety. In imposing a five-color limit, Tipp City reasonably could have concluded that allowing more colors would distract motorists and result in garish displays. Our role is not to micromanage these determinations. Tipp City enjoys some leeway in determining how to advance its interests through its exercise of legislative judgment. *Clear Channel Outdoor,* 608 F.Supp.2d at 503. Although the appellants contend that certain signs may be exempt from the five-color limit, it does not follow that *Cent. Hudson* is violated. As with the permit exemptions, a

degree of underinclusivity is allowed. Our review of the sign ordinance reveals that the vast majority of signs are limited to five colors. Notably, most, if not all, of those exempt from this requirement are permitted fewer than five colors. Finally, we do not believe that the five-color limit is more extensive than necessary to achieve Tipp City's interests in aesthetics and safety.

{¶ 39} The final provision at issue imposes size restrictions for wall signs. T.C.C. 154.100(A)(3). It provides: "The maximum allowable size for any wall sign shall be 1 square foot for every lineal foot of width of the building face to which the sign is attached, but shall not exceed the maximum size allowed for the use by Appendix F unless located along the interstate in a Business/Commercial or Industrial District." This provision limits wall signs to one square foot for every foot of building width, subject to absolute limits found in Appendix F. The size caps do not apply, however, along the interstate in certain districts. We infer, then, that wall signs in those locations may be one square foot for every foot of building width with no maximum size.

{¶ 40} Based on the exhibits before us, the appellants' mural appears to front the interstate. It also appears to be a business/commercial or industrial area. If so, the mural is not subject to any of the absolute size caps set forth in Appendix F. Rather, under T.C.C. 154.100(A)(3), it simply may be one square foot for every lineal foot of width of the building face. On the other hand, if the mural is not located along the interstate in a business/commercial or industrial area, then Appendix F limits its size to 80 square feet. Either way, the size limit directly advances Tipp City's interests in aesthetics and traffic safety.

{¶ 41} In imposing its size limit, Tipp City reasonably could have concluded that allowing wall signs larger than those permitted under the ordinance would be distracting to motorists or visually unappealing. Based on its interests in aesthetics and traffic safety, Tipp City also reasonably may impose different size limits for wall signs located along the interstate in business/commercial or industrial districts and wall signs located in more residential areas. It is not unreasonable to permit bigger wall signs along the interstate in nonresidential areas, where smaller signs may attract less attention and where aesthetic concerns may be lessened. As noted above, Tipp City enjoys some discretion in making such determinations. Finally, we do not find the size limit for wall signs to be more extensive than necessary to achieve Tipp City's interests in aesthetics and safety.

{¶ 42} Having found the sign ordinance constitutional as applied, we turn to the appellants' facial challenge. Ordinarily, "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber* (1982), 458 U.S. 747, 767, 102 S.Ct. 3348, 73

L.Ed.2d 1113. "An exception to this rule is a challenge to laws and regulations on the ground that they are facially overbroad under the First Amendment." *XXL of Ohio*, 341 F.Supp.2d at 778. "The overbreadth doctrine is inapplicable when the entire scope of an ordinance restricts only commercial speech." Id. at 779, citing *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 496–497, 102 S.Ct. 1186, 71 L.Ed.2d 362. "When an ordinance restricts both commercial and non-commercial speech, however, a party whose purely commercial speech has been sanctioned may assert the non-commercial speech rights of others by using the overbreadth doctrine." Id., citing *Bd. of Trustees of the State Univ. of New York v. Fox* (1989), 492 U.S. 469, 481–482, 109 S.Ct. 3028, 106 L.Ed.2d 388, and *Metromedia*, 453 U.S. at 504, 101 S.Ct. 2882, 69 L.Ed.2d 800, fn. 11.

{¶ 43} In the present case, we agree with Tipp City that the appellants are limited to arguing the overbreadth of the four provisions that the trial court actually applied to their mural. As set forth above, the trial court found other portions of the ordinance unconstitutional, and Tipp City has not cross-appealed from the trial court's judgment. Under the overbreadth doctrine, a party must "allege an injury arising from the specific rule being challenged, rather than an entirely separate rule that happens to appear in the same section of the municipal code." *Prime Media, Inc. v. Brentwood* (C.A.6, 2007), 485 F.3d 343, 351. Overbreadth standing to challenge one requirement "does not magically carry over to allow it to litigate other independent provisions of the ordinance without a separate showing of an actual injury under those provisions." Id. at 350; see also *Covenant Media of South Carolina, L.L.C. v. N. Charleston* (C.A.4, 2007), 493 F.3d 421, 429–430 ("Although there is broad 'latitude given to facial challenges in the First Amendment context,' * * * a plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions"); *Maverick Media Group, Inc. v. Hillsborough Cty.* (C.A.11, 2008), 528 F.3d 817, 822 ("Thus, a plaintiff who has established constitutional injury as to himself under *a provision* of a statute may also attack *that provision* under the overbreadth doctrine to vindicate the rights of others not before the court").[5] Because the trial court has declared other portions of Tipp City's sign ordinance unconstitutional, and because only four provisions in the sign ordinance have been invoked to enjoin the appellants from displaying their mural, they can establish an injury only under the four provisions

---

5. Although the cited cases involved standing in federal court, the constitutional requirement that a litigant demonstrate an injury in fact applies equally in Ohio state courts. See, e.g., *Wilmington City School Dist. Bd. of Edn. v. Clinton Cty. Bd. of Commrs.* (2000), 141 Ohio App.3d 232, 238, 750 N.E.2d 1141.

that the trial court found applicable to them. Therefore, the appellants' over-breadth standing is limited to those provisions.

{¶ 44} Given that the provisions at issue regulate both commercial and noncommercial speech, we conclude that the overbreadth doctrine enables appellants to assert the noncommercial speech rights of others not before the court. In the context of noncommercial speech, the constitutionality of the provisions before us hinges on whether they are content based or content neutral. Content-based restrictions on noncommercial speech are presumptively unconstitutional and subject to strict scrutiny. *XXL of Ohio,* 341 F.Supp.2d at 781. To survive strict scrutiny, such regulations must be narrowly tailored to serve a compelling governmental interest. Id. On the other hand, content-neutral restrictions on noncommercial speech are evaluated using intermediate scrutiny. Id. at 782–783. Proper time, place, and manner restrictions will survive intermediate scrutiny. Id.

{¶ 45} In the present case, the trial court determined that the four provisions were content neutral and that they survived intermediate scrutiny. We have reasoned, logically enough, that "[a] restriction is considered content-neutral if it is imposed without any reference to the content of the speech." *State v. Cooper,* 151 Ohio App.3d 790, 2003-Ohio-1032, 786 N.E.2d 88, ¶ 10. Conversely, restrictions that apply to speech based on the topic or viewpoint expressed are content based. Id.

{¶ 46} As set forth above, the first of the four provisions at issue defines a "sign." The full definition is as follows:

{¶ 47} "A sign is defined as any name, number, symbol, identification, description, display, illustration, object, graphic, sign structure, or part thereof, whether permanent or temporary, which is affixed to, painted on, represented directly or indirectly upon, or projected onto a building, structure, lot, or other device, whether mobile or affixed to the ground, and which directs attention to any object, product, place, activity, person, institution, organization, or business. This definition includes all signs visible from any public right-of-way or adjacent property, including interior signs oriented towards the exterior facade of any building or structure as well as back-lighted translucent panels or strip lighting affixed to any wall or roof where any such panels or lighting serves to identify and attract attention rather than illuminate space for human activity." See T.C.C. 154.092.

{¶ 48} While pointing out that the foregoing definition is "extremely broad," the appellants do not appear to challenge its constitutionality or to argue on appeal that it is content based. For purposes of their facial challenge, the appellants instead attack the sign ordinance's permit requirement, color limita-

tions, and size restrictions. In any event, having examined the definition of a "sign," and absent any specific argument from the appellants, we see no constitutional infirmity.[6] We reach the same conclusion regarding the ordinance's more specific definition of a "wall sign," which is set forth above as part of our *Cent. Hudson* analysis. In short, the definition covers any sign attached to or painted on the outside of a building. We find nothing unconstitutional about defining a wall sign this way.

{¶ 49} The second of the four provisions is the permit requirement for nonexempt signs. T.C.C. 154.093. This provision is content based because some of the signs excused from the permit requirement are identified based on their content.[7] Among other things, the ordinance exempts political flags, garage-sale signs, open-house signs, private traffic/directional signs, "informational" window signs bearing certain types of information, "residential information" signs bearing certain types of information, governmental signs, political signs, address signs, residential and commercial for-sale signs, scoreboards used for sporting events, security-system signs displaying certain types of information, identification signs, historical society and historical significance signs, and yard signs intended to display "personal" messages. T.C.C. 154.098.

{¶ 50} Having reviewed the foregoing exemptions, we harbor no doubt that at least some of them are content based. This is so because applicability of the exemptions depends on examining the content of the speech. For example, signs qualify as exempt "informational window signs" only if they bear information about certain things. The same is true of "residential information signs," which are exempt if they "display information necessary to the safety and convenience of residents and visitors." Likewise, signs qualify as exempt "yard signs" only if they "display personal messages." In short, whether a particular sign is permit exempt depends, at least in some cases, on what it says.

{¶ 51} For purposes of the appellants' facial challenge, we need not separately address each of the 24 exemptions to determine which ones are

---

6. Even assuming, arguendo, that the sign definition is content based, we see no First Amendment issue. The mere fact that a sign ordinance defines a word, in itself, cannot violate the First Amendment. As the present case illustrates, problems arise when certain signs are treated differently from others through regulations, but a definition does not regulate.

7. Case law uniformly supports the proposition that when exemptions from a restriction are based on content, the restriction itself necessarily is based on content. See, e.g., *Foti v. Menlo Park* (C.A.9, 1998), 146 F.3d 629, 636; *XXL of Ohio*, 341 F.Supp.2d at 789, fn. 15 ("A content-based exemption is no less a content-based distinction because it is phrased as exempting certain speech from a restriction rather than as imposing the restriction only on the burdened class of speech").

content based.[8] The fact that some of the exemptions are content based results in application of strict scrutiny. Under that standard, the exemptions must serve a compelling state interest and be narrowly tailored to serve that interest. *XXL of Ohio*, 341 F.Supp.2d at 789. Tipp City bears the burden to establish that the permit exemptions survive strict scrutiny. *Midwest Media Property, L.L.C. v. Symmes Twp.* (C.A.6, 2007), 503 F.3d 456, 477. On appeal, Tipp City does not even argue that the permit exemptions survive strict scrutiny. In any event, while the sign ordinance, as a whole, is intended to promote aesthetics and traffic safety, these are not compelling enough interests to justify Tipp City's content-based permit exemptions.[9] Id.; see also *Knoeffler v. Mamakating* (S.D.N.Y. 2000), 87 F.Supp.2d 322, 330.

 {¶ 52} Although Tipp City cannot enforce its permit requirement against the appellants,[10] we still must consider whether the ordinance's substantive provisions—such as its limits on the size and color of signs—are enforceable. As a result, we turn to the third and fourth provisions that the trial court found applicable to the appellants' mural. The third provision imposes color limits. It provides: "Signs shall be limited to five colors, including black and white. The background color is considered 1 of the 5 permissible colors, unless channel letters are used, in which case the background is not [to] be considered 1 of the 5 permissible colors." T.C.C. 154.099(C)(3). The appellants insist that this color restriction is content based for two reasons. First, they contend that different color restrictions apply to different signs, depending on their content. Second, even assuming that the five-color limit applies equally to all signs, the appellants insist that any limit on the number of colors a sign may contain necessarily is content based because "color *is* content."

---

8. Parenthetically, we note that most of the exemptions appear to be content based. Cf. *Foti,* 146 F.3d at 636 ("Here, the exemptions for 'open house' real estate signs and safety, traffic, and public informational signs are content-based. * * * To enforce the ordinance, a law enforcement officer must 'examine the content of * * * signs to determine whether the exemption applies.' *Desert Outdoor Advertising v. City of Moreno Valley,* 103 F.3d 814, 820 (9th Cir.1996)) (applying content-based test to exemptions for official notices, directional, warning, or information structures, public utility signs, and structures erected near a city or county boundary which contain the name of the city, county, or civic, fraternal, or religious organizations located therein); *Natl. Advertising,* 861 F.2d at 248 (applying content-based test to exemptions for memorial tablets or plaques, real estate and construction signs, open house signs, and traffic and safety signs).''

9. In light of this conclusion, the appellants concede the mootness of their alternative argument about the permit requirement constituting an unlawful prior restraint because the ordinance lacks time limits for a permit decision and places unbridled discretion in Tipp City's hands.

10. In our analysis, infra, we will address whether the permit-requirement exemptions, or even the permit requirement itself, may be severed from the sign ordinance to preserve its constitutionality.

**580**

{¶ 53} With regard to the former argument, we agree. T.C.C. 154.099(C)(3) establishes a general rule that "[s]igns shall be limited to five colors." On its face, this limitation appears content neutral—much like the ordinance's requirement that all signs must have a permit. Once again, however, the ordinance proceeds to make exceptions for certain signs.

{¶ 54} "Community activity and/or special event" signs, which may not contain any commercial advertising and must be "promotional," are limited to three colors.[11] T.C.C. 154.097(B)(2) and (4). Similarly, "public banners" to "promote the community and city-sponsored events" are limited to three colors. T.C.C. 154.098(E). We conclude that these provisions providing a different color limit for signs or banners promoting certain activities or events are content based. In light of these provisions, a sign reading "Attend the Mum Festival" would be promotional and restricted to three colors, whereas a sign reading "Boycott the Mum Festival" would be nonpromotional and allowed five colors. Additional content-based color exceptions to the five-color limit also exist. For example, signs advertising ATM machines are limited to three colors, and seasonal business signs are limited to four. T.C.C. 154.101(G) and (I). Signs advertising or promoting other things apparently may include five colors under the general rule found in T.C.C. 154.099(C)(3).[12]

{¶ 55} Because the foregoing exceptions to the five-color limit are content based, they are subject to strict scrutiny.[13] Once again, Tipp City makes

---

11. The sign ordinance defines a "community activity/special event" as follows: "An activity or event that is open to the general public, utilizes city facilities or services, and sponsored by a public, private nonprofit or religious organization that is educational, cultural, or recreational in function. Charitable events sponsored by for-profit organizations are also considered community activities. Examples of a community activity are a school play or a church fair. A special event is educational, cultural or recreational in function. Such events must be coordinated through the city. Examples of a special event are the Memorial Day Parade and the Mum Festival." T.C.C. 154.092.

12. Other portions of the sign ordinance specifically impose five-color limits for "informational window signs" and certain banners. See T.C.C. 154.098(M) and 154.101(B)(2). Because these provisions impose a five-color limit, they appear to be merely duplicative of the five-color limit set forth in T.C.C. 154.100(A)(3). We note too that all wall signs on multistory corporate office buildings along Interstate Route 75 are limited to one color. T.C.C. 154.101(A)(1). This limitation appears to us to be a permissible, content-neutral time, place, and manner restriction. Finally, while the appellants contend that certain signs in the ordinance "may have no color limitation" at all, we have found no such signs.

13. Although the exceptions to the five-color limit are found in sections other than T.C.C. 154.099(C)(3), the provision actually applied to the appellants' mural, examination of the exceptions is permissible because it reveals the content-based nature of the general five-color limit itself. As we have recognized above, where an exception to a rule is content based, the rule itself necessarily is content based. In such a case, application of the general rule depends on the content of the regulated material not falling within an exception.

no argument that they survive this exacting standard of review, and we conclude that they do not. As we did in our analysis of the permit exemptions, we conclude that Tipp City's interests in aesthetics and safety are not compelling enough to justify content-based distinctions in its color limits for signs.[14]

{¶ 56} Even if we were to sever the content-based exceptions to the five-color requirement, an issue we will address infra, the appellants' alternative argument would remain. As set forth above, the appellants contend that *any* color limit is content-based. This is so, they reason, because "color *is* content." In support, they rely largely on *Tinker v. Des Moines Indep. Comm. School Dist.* (1969), 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, which upheld the right of students to wear black armbands protesting the Vietnam war, and similar cases. In *Tinker*, however, school officials sought to ban the expression of a particular opinion, namely opposition to the Vietnam War, which the black armbands symbolized. Id. at 508–509, 89 S.Ct. 733, 21 L.Ed.2d 731. In limiting signs to five colors, Tipp City is not seeking to suppress the content of a message. Instead, it is restricting only the manner in which the appellants' mural may be displayed. See, e.g., *Burke v. Charleston* (D.S.C.1995), 893 F.Supp. 589 (citing cases upholding color restrictions as content neutral, and holding that an ordinance imposing color limits on an artist's wall mural was content neutral), vacated on other grounds (C.A.4, 1998), 139 F.3d 401. The fact that Tipp City's color limit may have an incidental impact on an artist "who aspires to use allegedly lurid colors to express himself" does not make the five-color limit impermissibly content based. Id. at 610. To the contrary, if uniformly applied, a five-color limit would be a time, place, and manner restriction justified by aesthetic and safety concerns. As set forth above, however, Tipp City's five-color limit is not uniformly applied. Rather, the sign ordinance contains impermissible content-based exceptions to the five-color limit.

{¶ 57} The next issue is whether Tipp City's size limits for signs are content based. For present purposes, we focus on T.C.C. 154.100(A)(3), which imposes size restrictions for a wall sign—the type of sign at issue. That provision states: "The maximum allowable size for any wall sign shall be 1 square foot for every lineal foot of width of the building face to which the sign is attached, but shall not exceed the maximum size allowed for the use by Appendix

---

14. We find *Regan v. Time, Inc.* (1984), 468 U.S. 641, 104 S.Ct. 3262, 82 L.Ed.2d 487, a case relied on by Tipp City, to be distinguishable. There, the Supreme Court found that a color regulation was content-neutral because the government did "not need to evaluate the nature of the message being imparted in order to enforce the color and size limitations." Id. at 656, 104 S.Ct. 3262, 82 L.Ed.2d 487. As set forth above, however, evaluation of the nature of the message is necessary to enforce the color limitations in Tipp City's sign ordinance.

F unless located along the interstate in a Business/Commercial or Industrial District."

{¶ 58} As noted in our "as applied" analysis above, T.C.C. 154.100(A)(3) limits wall signs to one square foot for every foot of building width, subject to size caps for various uses set forth in Appendix F.[15] The regulation further carves out an exception for wall signs along the interstate in "Business/Commercial" or "Industrial" districts. These signs may be one square foot for every foot of building width with no maximum size.

{¶ 59} Once again, a general rule that wall signs may be no more than one square foot for each lineal foot of width appears, on its face, to be content neutral. Indeed, it purports to cover all wall signs without regard to content. Even the exception for wall signs along the interstate in certain districts appears to be content neutral, insofar as it makes a size distinction based on location rather than content. Appendix F, however, is more problematic. It caps the size of various signs based on their content. Notwithstanding the general rule that all wall signs may be no more than one square foot for each lineal foot of width, Appendix F provides that in residential areas, school or church wall signs may not exceed 20 square feet, day-care wall signs may not exceed eight square feet, and home-occupation wall signs may not exceed one square foot. "For sale/for lease" wall signs are not permitted at all in residential areas. In nonresidential areas, school, church, and library wall signs may be 20 square feet, development signs may be 32 square feet, day-care or nursing-home signs may be 20 square feet, office signs may be 50 square feet, and "general commerce" or "service station" signs may be 80 square feet. We note, too, that a few of the permit-exempt signs discussed above, which T.C.C. 154.098 excuses from most restrictions in the sign ordinance,[16] seemingly do not have any size limits. T.C.C. 154.098. For example, even though permit-exempt "historical significance signs" conceivably might be displayed on a wall, they are not subject to the size restrictions for wall signs under T.C.C. 154.100(A)(3). See T.C.C. 154.098 (subjecting exempt signs to the restrictions of T.C.C. 154.096, 154.097, and 154.099 but not to the size restrictions of T.C.C. 154.100(A)(3)).

---

**15.** There is no indication in the trial court's ruling that it severed Appendix F, which T.C.C. 154.100(A)(3) expressly incorporates by reference.

**16.** T.C.C. 154.098 specifies that permit-exempt signs "are subject to the restrictions listed in §§ 154.096, 154.097, and 154.099 of this subchapter and Appendix B following this chapter, unless expressly exempted." Most of the ordinance's size restrictions, including the size restrictions for wall signs, are found elsewhere. Under the cannon of statutory interpretation "expressio unius est exclusio alterius," the implication of 154.098 is that some permit-exempt signs do not have size limits.

{¶ 60} Having reviewed T.C.C. 154.100(A)(3), we agree with the appellants that the foregoing size distinctions for wall signs are content based.[17] Therefore, strict scrutiny applies, and Tipp City must show that the distinctions serve a compelling interest and that they are narrowly tailored to serve that interest. On appeal, Tipp City does not even argue that its size distinctions survive strict scrutiny. In any event, we conclude that Tipp City's interests in aesthetics and safety are not compelling enough to justify content-based size distinctions for wall signs.

{¶ 61} Based on the preceding analysis, we hold that the sign ordinance's general definition of a "sign" and more specific definition of a "wall sign" are constitutional, at least some of the sign ordinance's exemptions from the permit requirement are unconstitutionally content based, at least some of the sign ordinance's exceptions to the five-color limit are unconstitutionally content based, and the sign ordinance's size distinctions for wall signs are unconstitutionally content based. In light of these determinations, issues of severability now must be addressed.

{¶ 62} Preliminarily, we note our inability to sever the content-based exemptions from Tipp City's permit requirement. We cannot sever an unconstitutional exemption when doing so would extend an ordinance's reach beyond what a legislative body intended. *State ex rel. English v. Indus. Comm.* (1953), 160 Ohio St. 215, 218–219, 52 O.O. 27, 115 N.E.2d 395 (Taft, J., concurring). The result of invalidating Tipp City's permit exemptions would be to subject formerly exempt signs to a permit requirement. This we cannot do. Id. at 218, 52 O.O. 27, 115 N.E.2d 395, quoting *State ex rel. Wilmot v. Buckley* (1899), 60 Ohio St. 273, 296, 54 N.E. 272 (" 'It is urged, however, that, if this exception makes the act unconstitutional, the exception should be disregarded, and the act held valid, as operating uniformly throughout the state. The answer to this is that the court has no lawmaking power, and cannot extend a statute over territory from which it is excluded by the general assembly.' "); *State Bd. of Health v. Greenville* (1912), 86 Ohio St. 1, 35–36, 98 N.E. 1019 ("It is suggested that if this exception, classification, or whatever it may be called should be found to be unconstitutional that portion alone of the statute should be declared void, and the balance permitted to stand; but that cannot be done, for the reason that the statute would then apply to the municipalities now excluded from its operation. A court

---

17. Cf. *Ladue v. Gilleo* (1994), 512 U.S. 43, 59–60, 114 S.Ct. 2038, 129 L.Ed.2d 36 (O'Connor, J., concurring) (strongly suggesting without deciding—because the lead opinion did not address the issue—that an ordinance was content based where it banned signs on private property but exempted road and driveway signs, health-inspection signs, signs for churches, religious institutions, and schools, identification signs for nonprofit organizations and public-transportation stops, real estate sale or rental signs, and commercial signs).

may sometimes hold a portion of the statute unconstitutional and the balance of the statute valid, when the result would be to relieve persons or territory from the provisions of the statute; but it can never do this when the result would be to extend the law to additional persons or territory. To do this would be invading the province of the General Assembly, and would be legislating for territory never included by the General Assembly in the operation of the statute"). This is true regardless of a severability clause. *State ex rel. English,* 160 Ohio St. at 219–220, 52 O.O. 27, 115 N.E.2d 395. Accordingly, the permit requirement itself is unconstitutional and cannot be enforced.

{¶ 63} Unlike the permit exemptions, however, no similar impediment would preclude severing the offending exceptions to the sign ordinance's five-color limit. We were unable to sever the permit exemptions because doing so would expand the ordinance's scope by subjecting formerly exempt signs to a permit requirement. Severing offending color exceptions, however, would not treat the impacted signs more harshly. To the contrary, it would treat them more favorably by allowing them to contain five colors rather than only three or four. Moreover, the effect would be to create uniform color limits, which is a content-neutral result. Using the same analysis, the content-based size distinctions in Appendix F theoretically might be severed from the sign ordinance to produce a uniform regulation limiting all wall signs to one square foot for every foot of building width regardless of content.

{¶ 64} The fundamental problem with the foregoing approach is that the sign ordinance would be reduced to a shell of itself. As we noted earlier, the trial court already declared unspecified but apparently substantial parts of the sign ordinance unconstitutional and severed them from the four provisions addressed herein. Although the extent of the trial court's severance is unclear, Tipp City itself seems to interpret the trial court's ruling, which it did not cross-appeal, to mean that the sign ordinance is unconstitutional except for the four provisions discussed above. Indeed, Tipp City reasons on appeal that the "[a]ppellants can determine what provisions the court severed from its holding that four sections survived." Regardless of the intended scope of the trial court's severance, our analysis herein would require still more severing. First, the entire permit requirement must be stricken because its exemptions are unconstitutionally content based. In addition, the exceptions to the five-color limit must be excised, and the content-based size distinctions in Appendix F must be removed from the sign ordinance. In the wake of these changes, the result would be an ordinance that defines various signs, allows everyone to post a sign without a permit, imposes a five-color limit for virtually all signs, and requires wall signs to be no bigger than one square foot for every foot of building width, while possibly allowing non-wall signs to be an unlimited size.

{¶ 65} At least one Ohio federal district court has held that simply severing a permit requirement from a municipal sign ordinance is improper. In *XXL of Ohio*, the United States District Court for the Northern District of Ohio reasoned: "With the exception of some temporary signs, all permanent and temporary signs require permits. If the scheme for granting permits is unconstitutional, a court cannot determine whether the council would prefer that all signs be allowed without a permit. Once the permit scheme is stricken, a court cannot give effect to the intention of the council in that contingency because the council's intention is not known." Id., 341 F.Supp.2d at 804. Likewise, the same court found that a ban on pole signs with certain exemptions was nonseverable because "a court cannot know whether the council would prefer that the ban on pole signs be struck to preserve the exemptions or whether the exemptions should be struck to preserve the ban on pole signs." Id.

{¶ 66} "In order to sever a portion of a statute, we must first find that such a severance will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." *State ex rel. Maurer v. Sheward* (1994), 71 Ohio St.3d 513, 523, 644 N.E.2d 369. To make this finding, we must determine, among other things, that it is possible through severance to give effect to the apparent intention of the city council. *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 126. Just as in *XXL of Ohio*, however, it is impossible to discern that intention here. Although not critical to our ruling, we note too that Tipp City has not identified, and we have not found, any clause in the sign ordinance even suggesting the existence of a general legislative preference for severance.

{¶ 67} In any event, we are persuaded by the appellants' argument that further severing the sign ordinance to comply with our ruling would fundamentally disrupt the scheme for regulating signs, result in a hollow ordinance, and compel us to speculate at the preferences of Tipp City's city council. Accordingly, we conclude that the sign ordinance's permit requirement, color limits, and size restrictions are nonseverable and unenforceable against the appellants' mural. The trial court erred in holding otherwise.

### III. Conclusion

{¶ 68} Based on the analysis set forth above, we sustain the appellants' assignment of error and reverse the trial court's January 16, 2009 final judgment entry and order granting Tipp City a permanent injunction and enjoining the appellants from displaying their mural in alleged violation of the sign ordinance. Having found no genuine issues of material fact, we conclude that the trial court should have sustained the appellants' cross-motion for summary judgment and entered judgment in their favor for declaratory and injunctive relief under

Section 1983, Title 42, U.S.Code prohibiting Tipp City from enforcing its sign ordinance. In light of this determination, the appellants qualify as "prevailing parties" under Section 1983, Title 42, U.S.Code and are entitled to reasonable attorney fees. *Berger v. Mayfield Hts.* (C.A.6, 2001), 265 F.3d 399, 406.

{¶ 69} The judgment of the Miami County Common Pleas Court is hereby reversed, and the cause is remanded for the entry of final judgment in favor of the appellants on their counterclaims under Section 1983, Title 42, U.S.Code for declaratory and injunctive relief and for an award of reasonable attorney fees under Section 1983, Title 42, U.S.Code.

Judgment reversed
and cause remanded.

DONOVAN, P.J., and FAIN, J., concur.